COPY

1  JONATHAN B. COLE (SBN 70460)
   *jcole@nemecek-cole.com*
2  MATTHEW J. HAFEY (SBN 167122)
   *mhafey@nemecek-cole.com*
3  NEMECEK & COLE
   A Professional Corporation
4  15260 Ventura Boulevard, Suite 920
   Sherman Oaks, California 91403-5344
5  Telephone: (818) 788-9500
   Facsimile: (818) 501-0328
6
   Attorneys for ~~Defendant~~ *Plaintiff*
7  JAMES RIVER INSURANCE COMPANY

ORIGINAL FILED
FEB - 4 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

WHA

10

11

12  JAMES RIVER INSURANCE          )   CV 08   0784
    COMPANY, an Ohio corporation,  )   Case No.
13                                  )
                    Plaintiff,      )   **COMPLAINT FOR**
14                                  )   **DECLARATORY RELIEF**
         -vs-                       )
15                                  )
    LAW OFFICES OF JAMES JAY        )
16  SELTZER, a business entity form )
    unknown; JAMES JAY SELTZER, an  )
17  individual                      )
                                    )
18                  Defendants.     )
                                    )
19  _____

20        Plaintiff JAMES RIVER INSURANCE COMPANY ("JRIC") for its Complaint

21  against the above-named defendants, upon knowledge, information and belief, alleges as

22  follows:

23        1.    This is an action by JRIC pursuant to 28 U.S.C. §§ 2201 and 2202 for a

24  declaratory judgment regarding its rights and obligations under Lawyers Professional

25  Liability Policy No. 00003944-2, issued to the LAW OFFICES OF JAMES JAY

26  SELTZER ("LAW OFFICES"), for the April 10, 2006 to 2007 policy period (the

27  "Policy"), a copy of which is attached hereto as Exhibit "A" and incorporated herein by

28  ///

-1-

this reference. In this action, JRIC seeks a determination that no coverage is available under the Policy for a claim identified below.

## JURISDICTION AND VENUE

2.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship between plaintiff and defendants and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. An actual controversy within the meaning of 28 U.S.C. § 2201 exists between the parties.

3.    Venue is proper pursuant to 28 U.S.C. § 1391, in that a substantial part of events giving rise to this action occurred in the this district and defendants in this action reside in this district.

## PARTIES

4.    At all relevant times herein, JRIC was a corporation organized under the laws of the State of Ohio whose principal place of business is located in Richmond, Virginia. JRIC is an insurance company authorized to transact business in California on a non-admitted basis as an Excess and Surplus Lines carrier.

5.    JRIC is informed and believes and thereon alleges that Defendant Law Offices of James Jay Seltzer ("LAW OFFICES") is a sole proprietorship organized and existing under the laws of the State of California whose principal place of business is located in the City of Emeryville, County of Alameda, State of California.

6.    JRIC is informed and believes and thereon alleges that Defendant James Jay Seltzer ("JJS") is an individual residing in the County of Alameda, State of California. LAW OFFICES and JJS are sometimes collectively referred to herein as "SELTZER."

## INTRADISTRICT ASSIGNMENT

7.    Intradistrict assignment to the San Francisco or Oakland Courthouse is appropriate as JRIC is informed and believes that LAW OFFICES and JJS both "reside" in the County of Alameda, State of California.

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500  FACSIMILE (818) 501-0328

1896016P.1.wpd    COMPLAINT FOR DECLARATORY RELIEF

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500  FACSIMILE (818) 501-0328

## FACTUAL ALLEGATIONS

8.    On or about March 10, 2006, SELTZER submitted a completed Application for Lawyer's Professional Liability Insurance to his insurance broker, Egloff Insurance Agency ("EGLOFF").  On March 17, 2006 Egloff submitted Seltzer's completed Application to JRIC.  EGLOFF then submitted two Supplemental Application forms to JRIC on SELTZER's behalf dated March 23, 2006.  JRIC issued Policy No. 00003944-2 effective April 10, 2006 in reliance on the Application and Supplemental Application submitted by SELTZER.  True and correct copies of the Application and Supplemental Application are attached hereto as Exhibits "B" and "C."

9.    The Application (attached hereto as Exhibit "B") states, at page 4, in the **NOTICE TO APPLICANT** section:

> "The Insurer will rely upon this application and all such
> attachments in issuing the policy.  If the information in this
> application or any attachment materially changes between the
> date this application is signed and the effective date of the
> policy, the Applicant will promptly notify the Insurer, who
> may modify or withdraw any outstanding quotation or
> agreement to bind coverage."
>
>                              * * *
>
> "**WARRANTY**: I warrant to the Insurer, that I understand
> and accept the notice stated above and that the information
> contained herein is true and that it shall be the basis of the
> policy of insurance and deemed incorporated therein, should
> the Insurer evidence its acceptance of this application by
> issuance of a policy."

10.   The Policy (attached hereto as Exhibit "A") provides:

>                         "PROVISIONS
>
>                              * * *

-3-

In consideration of payment of the premium, and in reliance upon the statements made in the Application and its attachments and any materials submitted therewith, all of which are made a part hereof, and subject to the Declarations and all of the terms and conditions of this Policy, including any endorsement hereto, we agree with you as follows . . ."

\* \* \*

"SECTION III – EXCLUSIONS

This Policy does not apply to any 'Claim' against the 'Insured':

a.    Based on or directly or indirectly arising from:

(1)    A 'professional service' rendered prior to the effective date of the Policy if any insured knew or could have reasonably foreseen that the 'professional service' could give rise to a 'claim.'"

11.    JRIC is informed and believes, and thereon alleges, that in February, 2003, Pon Lee ("PON LEE") paid a $25,000 retainer to Seltzer to investigate and prosecute a claim against Vision, LP, Lee Capital Management and Thomas Lee ("VISION"), a commodity futures trading firm, for VISION's alleged churning of PON LEE's account. On December 8, 2005, SELTZER filed a Demand for Arbitration on behalf of PON LEE with the National Futures Association ("NFA"). The NFA initially rejected the filing, which was resubmitted and served in early March, 2006. On March 14, 2006, VISION's principal, Thomas Lee, sent SELTZER a letter via facsimile demanding that SELTZER withdraw the Demand for Arbitration. In his letter, Thomas Lee outlines

/ / /

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500  FACSIMILE (818) 501-0328

COMPLAINT FOR DECLARATORY RELIEF

1  VISION's defenses, asserting among other things that the claim was time barred well
2  before the Demand for Arbitration was filed or served on VISION.

3      12.  The Application for the Policy asks:

4          "29.  In the past five years, how many claims have been
5                alleged against attorneys in your firm (past and
6                present)? ___.  For each, please complete a claims
7                supplement."

8  SELTZER responded "2" and provided information on those claims (which have
9  nothing to do with PON LEE) on two claims supplement forms attached to the Policy.

10     13.  The Application continues:

11         "30.  Are you or any member of your firm aware of any
12               incident, act, error or omission that may result in a
13               Claim or disciplinary action being brought against you,
14               which you have not mentioned in question[] 29?"

15  SELTZER responded "No."

16     14.  JRIC is informed and believes and thereon alleges that, in late April of
17  2007, PON LEE retained counsel (James Rummonds, Esq. ("RUMMONDS")) who
18  then contacted SELTZER about a potential claim for legal malpractice associated with
19  the missed statute of limitations (the "PON LEE Matter").  SELTZER did not notify
20  JRIC of this communication.  RUMMONDS presented SELTZER with a Tolling
21  Agreement, which SELTZER signed without first obtaining approval from JRIC.  In late
22  August, 2007, RUMMONDS again contacted SELTZER and outlined PON LEE's
23  claims against him and made a demand for money.  SELTZER tendered this demand to
24  JRIC and requested that JRIC defend and indemnify SELTZER.  SELTZER and PON
25  LEE have entered into a Tolling Agreement and, as of the filing of this Complaint, PON
26  LEE has not filed a lawsuit against SELTZER.

27     15.  SELTZER did not disclose the facts and circumstances of the alleged late
28  filing of the Demand for Arbitration in the PON LEE Matter to JRIC, either in the

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500  FACSIMILE (818) 501-0328

1896016P.1.wpd                    COMPLAINT FOR DECLARATORY RELIEF

1 | Application or the Supplemental Application. SELTZER's first notice to JRIC

2 | regarding a potential Claim in the PON LEE Matter was reported to JRIC in January,

3 | 2007, over nine months after the Policy incepted and at least ten months after SELTZER

4 | had actual notice of "an incident, act, error or omission that may result in a claim" being

5 | made by PON LEE.

6 |   16.    JRIC has agreed to defend SELTZER pursuant to a written reservation of

7 | rights, including the right to deny coverage based on (a) SELTZER's material omission

8 | of information regarding the circumstances of the PON LEE claim in the Application;

9 | (b) violation of the Voluntary Payments provision of the Policy ("You will not, except at

10 | your own cost, voluntarily make any payment, assume any obligation, or incur any

11 | expense"); and (c) violation of the Cooperation Clause ("You shall cooperate with us

12 | and provide us with all information and assistance which we reasonably request

13 | including without limitation attend hearings, depositions and trials and assisting in

14 | effecting settlements, securing and giving evidence and conducting the defense of any

15 | Claim. covered by this Policy. You shall do nothing that may prejudice our position").

16 | JRIC also reserved rights for indemnity purposes based on other provisions contained in

17 | the Policy. JRIC further reserved the right to (I) withdraw from the defense altogether;

18 | (ii) seek reimbursement of the attorney's fees and costs incurred by SELTZER; (iii)

19 | seek reimbursement of the attorney's fees and costs which relate to non-covered claims;

20 | (iv) refuse to pay for any judgment ultimately rendered against SELTZER; and (v)

21 | rescind the Policy altogether.

## COUNT I

### JRIC Is Entitled to a Judicial Declaration Against all Defendants That JRIC Does Not Have a Duty to Defend the PON LEE Matter

25 |   17.    JRIC repeats and incorporates by reference the allegations in paragraphs 1

26 | through 16 of this Complaint.

27 |   18.    A true and present controversy exists between JRIC, on the one hand, and

28 | SELTZER, on the other, in that JRIC contends that the Policy unambiguously excludes

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500   FACSIMILE (818) 501-0328

-6-

1  coverage for "any 'Claim' against the 'Insured' . . . [b]ased on or directly or indirectly

2  arising from . . . [a] 'professional service' rendered prior to the effective date of the

3  Policy if any insured knew or could have reasonably foreseen that the 'professional

4  service' could give rise to a 'claim.'"  Accordingly, JRIC contends that it does not have

5  a duty to defend SELTZER in the PON LEE Matter, and is entitled to recover from

6  SELTZER any and all attorney's fees and costs advanced in defense of the PON LEE

7  Matter from the time of tender through settlement or final judgment.

8         19.    In the alternative, JRIC contends that it is entitled to rescind the Policy

9  based on the material omissions of SELTZER in the Application.  Additionally, the

10  Application, the Policy and California law impose an affirmative duty upon SELTZER

11  to provide updated responses to questions in the Application up to and through the

12  inception date of the Policy.

13         20.    JRIC is informed and believes that SELTZER contends otherwise.

14         21.    A judicial determination is necessary to determine the respective rights of

15  the parties hereto pursuant to the terms, conditions, exclusions and endorsements of the

16  Policy and the Application.

17                                    **COUNT II**

18  **JRIC Is Entitled to a Judicial Declaration Against all Defendants That JRIC Does**

19  **Not Have a Duty to Indemnify SELTZER for Damages or other Relief Arising**

20                          **from the PON LEE Matter**

21         22.    JRIC repeats and incorporates by reference the allegations in paragraphs 1

22  through 21 of this Complaint.

23         23.    A true and present controversy exists between JRIC, on the one hand, and

24  SELTZER, on the other, in that JRIC contends that the Policy unambiguously excludes

25  coverage for the PON LEE Matter as set forth above.

26         24.    To the extent that the PON LEE Matter ripens into a lawsuit and PON LEE

27  alleges intentional conduct, damages arising from such conduct are excluded pursuant to

28  the Policy, Section III, Exclusions k and l, as well as applicable California law.

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500  FACSIMILE (818) 501-0328

25.    To the extent that the PON LEE Matter ripens into a lawsuit and PON LEE alleges that SELTZER is liable for the "payment of any fine, sanction or penalty," or seeks treble damages, a Lodestar multiplier, or other multiple damages, such fines sanctions or penalties are excluded pursuant to the Policy, Section III, Exclusion m, the definition of "Damages" under the Policy, as well as applicable California law.

26.    To the extent that emotional distress damages are ever alleged, such damages would be precluded under the Policy, Section III, Exclusion d, which precludes coverage for "any actual or alleged 'bodily injury' to or sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof."

27.    Based upon the foregoing, JRIC contends that it has no duty to indemnify SELTZER pursuant to the Policy.  JRIC is informed and believes that SELTZER contends otherwise.

28.    A judicial determination is necessary to determine the respective rights of the parties hereto pursuant to the terms, conditions, exclusions and endorsements of the Policy and the Application.

WHEREFORE, Plaintiff JRIC requests that the Court enter judgment in its favor:

**ON COUNT I OF THE COMPLAINT**

A.    A judicial declaration that there is no potential for coverage for the PON LEE Matter under the Policy, and therefore that JRIC does not and never did have a duty to defend SELTZER with regard to the PON LEE Matter;

B.    Recovery of all of the attorney's fees and costs incurred or advanced by JRIC in defense of the PON LEE Matter from the time of tender through the time of settlement or final judgment;

C.    For interest and other recoverable costs;

**ON COUNT II OF THE COMPLAINT**

D.    A judicial declaration that there is no potential for coverage for the PON LEE Matter under the Policy, and therefore that JRIC does not and never

COMPLAINT FOR DECLARATORY RELIEF

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500  FACSIMILE (818) 501-0328

1896016P.1.wpd

did have a duty to indemnify SELTZER with regard to the PON LEE
Matter;

**ON ALL COUNTS OF THE COMPLAINT**

E.    Awarding JRIC such additional declaratory and other relief as shall be found to be appropriate under the circumstances.


Dated: February 1, 2008                 Respectfully Submitted,

                                        NEMECEK & COLE


                                        By _____
                                           JONATHAN B. COLE
                                           MATTHEW J. HAFEY
                                           Attorneys for Plaintiff JAMES RIVER
                                           INSURANCE COMPANY

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500  FACSIMILE (818) 501-0328

-9-

**EXHIBIT "A"**

# LAWYERS - PROFESSIONAL LIABILITY INSURANCE

### JAMES RIVER INSURANCE COMPANY
#### 7130 Glen Forest Drive, Suite 210
#### Richmond, Virginia 23226-3754

# DECLARATIONS

POLICY NUMBER:  00003944-2

**ITEM 1.** NAMED INSURED AND MAILING ADDRESS:
Law Offices of James Jay Seltzer
3300 Powell Street, Suite 201
Emeryville, CA  94608

PRODUCER:     14724
Egloff Insurance Agency, Inc.
20635 Ventura Boulevard
Woodland Hills,  CA  91364

**THIS POLICY PROVIDES CLAIMS-MADE COVERAGE. CLAIMS MUST FIRST BE MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND MUST BE REPORTED IN WRITING TO THE COMPANY DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF EXERCISED. THE PAYMENT OF CLAIM EXPENSES REDUCES THE LIMITS OF INSURANCE. PLEASE READ THE ENTIRE POLICY CAREFULLY.**

**ITEM 2.** POLICY PERIOD:          From: 04/11/2006          To: 04/11/2007
12:01 A.M. Standard Time at your mailing address

**ITEM 3.** PROFESSIONAL SERVICES: Lawyer

**ITEM 4.** LIMITS OF INSURANCE:

    A.  Each Claim Limit of Liability ................................................................$1,000,000
    B.  Annual Aggregate ..........................................................................$1,000,000

**ITEM 5.** RETROACTIVE DATE: 4/11/2002

**ITEM 6.** DEDUCTIBLE:    $50,000        each "Claim"

**ITEM 7.** PREMIUM: $67,500

**ITEM 8.** EXTENDED REPORTING PERIOD: <u>12</u> months at <u>100</u>% of the total annual premium.

**ITEM 9.** ENDORSEMENTS ATTACHED TO THE POLICY AT INCEPTION:
    See attached Schedule A – Schedule of Forms

# SCHEDULE A

FORMS AND ENDORSEMENTS THAT APPLY TO THIS POLICY:

**POLICY NO. 00003944-2**

**FORM NUMBER**         **DESCRIPTION**

| | |
|---|---|
| PL0015US-0603 | Lawyers Professional Liability Declarations |
| AP0001US-0403 | Schedule A |
| PL0003US-0603 | Lawyers Professional Liability Policy |
| AP2103US-0504 | Minimum Policy Premium |
| AP0100US-0403 | Privacy Policy |
| AP2112US-0804 | Terrorism Exclusion |
| AP2113US-0703 | Service of Suit |
| IL0021-0702 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| PL2101US-0603 | Combined General  Endorsement |
| PL2118US-0903 | Awareness Provision |
| PL2122US-0304 | Prior and Pending Litigation Exclusion |

# LAWYERS PROFESSIONAL LIABILITY POLICY

THIS IS A CLAIMS MADE AND REPORTED POLICY
PLEASE READ CAREFULLY

---

THIS POLICY IS WRITTEN ON A "CLAIMS-MADE AND REPORTED BASIS" AND PROVIDES PROFESSIONAL LIABILITY COVERAGE FOR THOSE CLAIMS THAT OCCUR SUBSEQUENT TO THE RETROACTIVE DATE STATED IN THE DECLARATIONS AND WHICH ARE FIRST MADE AGAINST YOU AND REPORTED TO US WHILE THIS POLICY IS IN FORCE. NO COVERAGE EXISTS FOR CLAIMS FIRST MADE AGAINST YOU AND REPORTED TO US AFTER THE END OF THE POLICY TERM UNLESS, AND TO THE EXTENT, AN EXTENDED REPORTING PERIOD APPLIES.

---

## PROVISIONS

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy the words "you" and "your" refer to the "Named Insured" shown in the Declarations, and any other person or organization qualifying as a "Named Insured" under this Policy. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION II – DEFINITIONS.

In consideration of payment of the premium, and in reliance upon the statements made in the Application and its attachments and any materials submitted therewith, all of which are made a part hereof, and subject to the Declarations and all of the terms and conditions of this Policy, including any endorsement hereto, we agree with you as follows:

SECTION I - COVERAGES

1.   **Insuring Agreement**

   a.   We will pay on behalf of the "Insured" those sums in excess of the deductible the "Insured" becomes legally obligated to pay as "Damages" and "Claims Expenses" because of a "Claim" first made against the "Insured" and reported to us in writing during the "Policy Period" by reason of a "Wrongful Act" in the performance of or failure to perform "Professional Services" by the "Insured" or by any other person or entity for whom the "Insured" is legally liable. The "Wrongful Acts" must have been committed on or subsequent to the "Retroactive Date" specified in the Declarations and before the end of the "Policy Period".

   b.   **Defense and Settlement**

   We shall have the right and duty to defend any covered "Claim" brought against the "Insured" even if the "Claim" is groundless, false or fraudulent. However, we will have no duty to defend the "Insured" against any "Claim" seeking "Damages" to which this insurance does not apply. You shall not admit or assume liability nor settle or negotiate to settle any "Claim", nor incur any "Claims Expenses" without our prior written consent. We shall have the right to appoint counsel and to make any investigation and defend any "Claim" as we deem necessary.

   We shall not settle any "Claim" without the written consent of the "Named Insured". If the "Named Insured" refuses to consent to a settlement recommended by us and acceptable to the claimant, then our Limit of Liability under this Policy with respect to such "Claim", shall be reduced to the amount of "Damages" for which the "Claim" could have been settled plus any "Claims Expenses" incurred up to the time we made our recommendation to the "Named Insured". This amount shall not exceed the unexhausted Limit of Liability as specified in the Declarations.

   We shall not be obligated to investigate, defend, pay or settle or continue to investigate, defend, pay or settle any "Claim" after the applicable Limit of Liability specified in the Declarations has been

PL0003US 06-03                                                                                                1 of 9

exhausted by payment of "Damages" and "Claims Expenses" or any combination thereof. In such case, we shall have the right to withdraw from further investigation, defense, payment or settlement of such "Claim" by tendering control of such "Claim" to you.

"Claims Expenses" are a part of and not in addition to the Limit of Liability. The payment by us of "Claims Expenses" reduces the applicable Limit of Liability.

# SECTION II – DEFINITIONS

Defined terms are in quotation marks throughout this Policy and may be used in either the singular or plural, as appropriate.

A. "Bodily Injury" means injury to the body, sickness or disease, including death resulting from such injuries. "Bodily Injury" also means mental injury, mental anguish, mental tension, emotional distress, pain and suffering, or shock, whether or not resulting from injury to the body, sickness, disease or death of any person.

B. "Claim" means a written demand for monetary damages arising out of or resulting from the performing or failure to perform "Professional Services".

C. "Claims Expenses" means:

   (1) attorney's fees, expert witness fees and other reasonable fees and costs paid by us or by you with our prior written consent, in the investigation and defense of covered "Claims";

   (2) reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a "Claim", including the cost of appeal bonds, however, we shall not be obligated to apply for or furnish appeal bonds on your behalf.

   "Claims Expenses" does not include your employees wages or salaries or the costs of your directors, officers or employees.

   All "Claims Expenses" are a part of the Limit of Liability and Deductible and shall not be considered sums payable in addition thereto.

D. "Damages" means any compensatory amount which you become legally obligated to pay as a result of a covered "Claim", including judgments, awards and settlements.

   "Damages" shall not include:

   (1) civil or criminal fines, penalties, sanctions, whether pursuant to law, statute, regulation or court rule;

   (2) punitive and exemplary damages and the multiplied portion of multiplied damages;

   (3) any matter, sum or award that is uninsurable under the law; or

   (4) the cost to comply with an injunctive or other non-monetary or declaratory relief.

E. "Disciplinary Proceeding" means any proceeding by a regulatory or disciplinary official or agency to investigate charges made by a client or former client alleging professional misconduct in performing or failing to perform "Professional Services".

F. "Insured" means the "Named Insured" and:

   (1) any past, present or future principal, partner, officer, director, stockholder, trustee or employee of the "Named Insured" but only with respect to "Professional Services" performed on behalf of the "Named Insured";

   (2) independent contractors who are natural persons, or any temporary or leased personnel but only while acting under your direct supervision and on your behalf;

(3) the estate, heirs, executors, administrators or legal representatives of any "Insured" described in subpart (a) or (b) above in the event of such "Insured's" death, incapacity, insolvency or bankruptcy but only to the extent that such "Insured" would otherwise be provided coverage under this policy; or

(4) Any "Subsidiary".

G.    "Named Insured" means the entity or person named in the Declarations.

H.    "Personal Injury" means:

(1) false arrest, detention or imprisonment;

(2) wrongful entry or eviction or other invasion of private occupancy; or

(3) the publication or utterance of a libel or slander or other defamatory or disparaging material or a  publication or utterance in violation of an individual's right of privacy.

I.    "Policy Period" means the period of time shown in the Declarations.

J.    "Professional Services" means those services performed by the "Insured" for others:

(1) as a lawyer, notary public or title agent;

(2) as an arbitrator, mediator or similar neutral;

(3) as an administrator, executor, conservator, receiver, guardian, escrow agent, trustee, or in any similar fiduciary capacity provided such services are performed in your capacity as a lawyer.

(4) as a member of a formal accreditation, ethics, peer review, licensing board, standards review board, bar association, or similar board or committee.

K.    "Property Damage" means any injury to or loss or destruction of tangible property, including the loss of use thereof

L.    "Related Claims" means all "Claims" arising out of a single "Wrongful Act" or series of "Related Wrongful Acts" in the performance of or failure to perform "Professional Services".

M.    "Related Wrongful Acts" means all "Wrongful Acts" that have as a common nexus any fact circumstance, situation, event, transaction cause or series of casually connected facts, circumstances, situations, events, transactions or causes.

N.    "Retroactive Date" means the date specified in the Declarations.

O.    "Subsidiary" means any entity in which the "Named Insured" owns either directly or indirectly   50% or more of the outstanding voting stock.

P.    "Wrongful Act" means any actual or alleged act, error, omission, "Personal Injury", neglect or breach of duty in the performing of or failure to perform "Professional Services".


SECTION III - EXCLUSIONS

This Policy does not apply to any "Claim" against the "Insured":

a.    Based on or directly or indirectly arising from:

(1) A "professional service" rendered prior to the effective date of the Policy if any insured knew or could have reasonably foreseen that the "professional service" could give rise to a "claim";

(2) Any common fact, circumstance, transaction advice or decision involved in a "professional service" reported as a claim or potential claim under any prior Policy; or

(3) Any "claim", suit, act, error or omission disclosed in the application for this Policy;

b.  Based on or directly or indirectly arising from an insured's performing "professional services" for:

   (1)  Any other insured under the Policy;

   (2)  Any firm, organization, entity or trust not named in the Declarations in which the insured

      (a)  has or had any ownership interest,

      (b)  is or was a director, officer, partner, principal shareholder or employee, or

      (c)  at any time managed, operated or exercised direct or indirect control;

c.  Based on or directly or indirectly arising out of the rights or duties under any agreement including disputes over fees for services;

d.  Based on or directly or indirectly arising out of any actual or alleged "bodily injury" to or sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof;

e.  Based on or directly or indirectly arising out of the insured's services or capacity as an accountant or advisor, agent or broker in real estate, investments, insurance or tax liability;

f.  Based on or directly or indirectly arising out of:

   (1)  The registering, qualifying or reporting under:

      (a)  the Securities Act of 1933

      (b)  the Securities Exchange Act of 1934

      (c)  the Investment Company Act of 1940

      (d)  the Public Utility Holding Company Act of 1935

      (e)  state Blue Sky laws, or

      (f)  any other law governing the registration or issuance of transactions involving securities;

   (2)  Private placement of private securities, limited partnerships, syndicates of any kind or real estate investment trusts;

g.  Based on or directly or indirectly arising out of or resulting from an act, error, or omission of an individual or entity with whom the insured shares common office space or common office facilities who is not an insured under this Policy;

h.  Based on or directly or indirectly arising out of or resulting from any insured's activities including acts performed in the capacity of a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto; except if the insured is deemed to be a fiduciary solely by reason of legal advice rendered with respect to any employee benefit plan;

i.  Based on or directly or indirectly arising out of or resulting from the notarization of a signature without the physical appearance of the signatory before the insured;

j.  Based on or directly or indirectly arising out of or resulting from any insured's capacity as an elected public official or as an employee of a governmental body, subdivision, or agency thereof unless the insured is deemed as employee solely by virtue of rendering legal services to such governmental body, the remuneration for which services inures to the benefit of an insured;

k.  Based on or directly or indirectly arising out of or resulting from any conspiracy, intentional breach of contract, intentional interference with rights or obligations, assault, battery, trespass or violations of the provisions of the Racketeer Influenced and Corrupt Organization Act 18 USC Sections 1961 et seq.;

l.  Based on or directly or indirectly arising out of or resulting from:

   (1)  Any act committed with knowledge of its wrongful nature or with the intent to cause damage;

PL0003US 06-03                                                                 4 of 9

    (2)    The gaining by the insured of any personal profit, gain or advantage to which the insured is not legally entitled;

    (3)    Any criminal, fraudulent, or dishonest act. However, we shall defend such allegations against the insured if it involves a "claim" otherwise covered under the Policy until final adjudication; or

    (4)    Judgments or awards arising from acts or omissions deemed uninsurable by law;

m.    For payment of any fine, sanction or penalty of any nature against the insured or the insured's client;

n.    Relating in whole or in part to the dissolution of the firm;

o.    Based on or directly or indirectly arising out of or resulting from Infringement of patent, copyright, trademark, service mark or trade name; or unfair competition based upon actual or alleged infringement of patent, copyright, trademark, service mark, or trade name;

p.    Based on directly or indirectly arising out of or resulting from any "claim" based on the unauthorized access to the insured's electronic data processing system;

q.    Based on or directly or indirectly arising out of any "Disciplinary Proceeding".

r.    Based on or directly or indirectly rising out of any "claim" for malicious prosecution.

## SECTION IV – LIMIT OF LIABILITY

1.    Our maximum liability for all "Damages" and "Claims Expenses" resulting from each "Claim" covered under this Policy shall not exceed the amount stated in the Declarations as LIMIT OF LIABILITY – EACH "CLAIM". Our maximum aggregate liability for all "Damages" and "Claims Expenses" resulting from all "Claims" covered by this Policy shall be the aggregate limit of liability stated in the Declarations as LIMIT OF LIABILITY – AGGREGATE.

2.    All "Claims" alleging, based upon, arising out of or attributable to the same "Wrongful Act" and "Related Wrongful Acts" shall be deemed to be a single "Claim" regardless of whether made against one or more "Insured" and such "Claim" shall be deemed first made on the date the earliest of such "Claims" is first made even if such date is before the "Policy Period"

3.    The number of "Insureds" covered by the Policy shall not operate to increase the Limit of Liability.

4.    Two or more "Claims" or suits arising out of the same, related or continuous "Professional Services" shall be considered a single "Claim".

5.    If two or more Polices of insurance issued by us apply to the same "Claim" or "Claims" for which any "Insured" is legally liable, we shall not be liable under this Policy for more than the Limit of Liability of that Policy issued by us which has the highest applicable Limit of Liability. If the Limit of Liability on each Policy is the same, only one limit will apply.

## SECTION V – DEDUCTIBLE

We shall only be liable for those amounts payable as "Damages" and/or "Claims Expenses" which are in excess of the applicable deductible stated in the Declarations. The "Deductible" shall apply separately to each "Claim" and shall be paid by you. You shall promptly make direct payments within the deductible to the appropriate parties as designated by us. We shall have no obligation to make payments within the deductible and then seek reimbursement from you.

## SECTION VI - TERRITORY

This Policy only applies to "Claims" which are brought in the United States, its territories or possessions, or Canada.

## SECTION VII – CONDITIONS

1.  Bankruptcy

    Bankruptcy or insolvency of the "Insured" or of the "Insured's" estate will not relieve us of our obligations under this Policy.

2.  Notice of "Claims"

    As a condition precedent to our obligations under this Policy, you shall give written notice to us as soon as practicable, but in no event later than 60 days after the end of the "Policy Period" of any "Claim" made against you.   You shall immediately forward to us every demand, notice, summons or other process or pleading received by you or your representative. You will not, except at your own cost, voluntarily make any payment, assume any obligation, or incur any expense.

3.  Assistance and Cooperation

    You shall cooperate with us and provide us with all information and assistance which we reasonably request including without limitation attend hearings, depositions and trials and assisting in effecting settlements, securing and giving evidence and conducting the defense of any "Claim" covered by this Policy.  You shall do nothing that may prejudice our position.

4.  Legal Action Against Us

    No person or organization has a right under this Policy to join us as a party or otherwise bring us into a suit asking for "Damages" from an "Insured".

    No action shall be brought against us, unless, as a condition precedent thereto, you shall have fully complied with all the terms of this Policy, and the amount of your obligation to pay shall have been fully determined either by judgment against you after actual trial and appeal or by written agreement between you, the claimant and us.

5.  Other Insurance

    This Policy shall be excess over any other valid and collectible insurance, self-insurance or indemnification available to you, whether such other insurance or indemnification is stated to be primary, contributory, excess, contingent, self insurance or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability of this Policy.

6.  Representations

    By accepting this Policy, you agree:

    A.  The statements in the Declarations are accurate and complete;

    B.  Those statements are based upon representations you made to us; and

    C.  We have issued this Policy in reliance upon your representations.

7.  Subrogation

    In the event of any payment under this Policy, we shall be subrogated to all of your rights of recovery against any person or organization and you shall execute and deliver instruments and papers and whatever else is necessary to secure such rights. You must do nothing after a "Claim" is made to impair such rights.

8.  "Named Insured" as Sole Representative

    The "Named Insured" shall act on behalf of all "Insureds" with respect to completing the Application for this insurance, including representing the truth and completeness of all information as required including providing Notice of "Claim" or Loss, giving or receiving notice of cancellation or non-renewal, paying premium or receiving unearned premium, agreeing to any changes in this Policy, and electing whether or not to purchase the Extended Reporting Period.

PL0003US 06-03                                                                                         6 of 9

9.  Cancellation and Non-Renewal

   A.  The "Named Insured" shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

   B.  We may cancel this policy by mailing or delivering to the "Named Insured" written notice of cancellation at least:

      (1)  10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

      (2)  30 days before the effective date of cancellation if we cancel for any other reason.

   C.  We will mail or deliver our notice the "Named Insured's" last mailing address known to us.

   D.  Notice of cancellation will state the effective date of cancellation.  The policy period will end on that date.

   E.  If this policy is cancelled, we will send the "Named Insured" any premium refund due.  If we cancel, the refund will be pro rata.  If the "Named Insured" cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

   F.  If notice is mailed, proof of mailing will be sufficient proof of notice.

   If we elect not to renew this Policy for an additional "Policy Period", we shall mail written notice to the "Named Insured" at the address shown in the Declarations.  Such written notice of non-renewal shall be mailed at least 30 days prior to the end of the "Policy Period".

10.  Acquisitions, Mergers and Material Changes

   In the event that after the inception date of this Policy you:

      A.  acquire all or substantially all of the assets of another entity; or,

      B.  merge with another entity such that you are the surviving entity; or,

      C.  create or acquire a subsidiary; or,

      D.  otherwise change your business as described in the application in a manner material to the risk underwritten by us,

then no coverage shall be afforded under this Policy for the assets acquired by you; the "Wrongful Acts" of the entity merged with, acquired by or created by you; or your changed business activities unless and until:

      A.  you provide written notice of any of the above events to us not more than thirty (30) days after the effective date thereof; and,

      B.  you provide us with such pertinent information that we may deem necessary; and,

      C.  you accept any special terms, conditions, exclusions and pay any additional premium charge required; and,

      D.  we, at our sole discretion, specifically agree in writing to provide such coverage.

Should we agree to provide coverage for the newly purchased or created entity or subsidiary, or for your changed business activities, such coverage will be only for "Wrongful Acts" first committed following the date we agree to provide such coverage.

11.  Assignment

   Assignment of any interest by you under this Policy shall not bind us without our written consent.

PL0003US 06-03

## SECTION VIII – EXTENDED REPORTING PERIOD

In the event of cancellation or non renewal of this Policy, by either the "Named "Insured"" or the Company, for reasons other than non payment of premium or material misrepresentation in the Application, you shall have the right to an Extended Reporting Period as follows:

(a)  Automatic Extended Reporting Period

Coverage as provided under this Policy shall automatically continue for a period of sixty (60) days following the effective date of such cancellation or non renewal, but only with respect to "Claims" and "Wrongful Acts" committed before the effective date of such cancellation or no renewal.

(b)      Optional Extended Reporting Period

You shall have the right, upon payment of the additional premium set forth in the Declarations, to an extension of the coverage provided under this Policy for the term set forth in the Declarations following the effective date of such cancellation or non renewal, but only with respect to "Claims" for "Wrongful Acts" committed before the effective date of such cancellation or non renewal.

This right shall terminate, however, unless written notice of such election and payment of the additional premium is received by us not later than thirty (30) days after the effective date of such cancellation or non renewal.  A change in Policy terms and conditions and/or premium shall not be considered non renewal for purposes of triggering either Extended Reporting Period

The entire premium for the Extended Reporting Period shall deemed fully earned and non refundable.

The fact that the period during which "Claims" may be reported to us under this Policy is extended by virtue of the Automatic and Optional Extended Reporting Periods does not in any way increase the Limits of Liability of this Policy.

## SECTION IX – ARBITRATION

Should we disagree as to the rights and obligations owed by us under this Policy, including the effect of any applicable statutes or common law upon the contractual obligations otherwise owed, either party may request that the dispute be subjected to binding arbitration.

In the event that the parties cannot agree upon an arbitration forum and process, The American Arbitration Association shall be used, with each party selecting an arbitrator from the list of qualified arbitrators for insurance coverage disputes provided by that association.  The two chosen arbitrators shall select a third arbitrator from the same list; if they cannot agree to a selection, the American Arbitration Association shall make the selection for them.  Each party shall bear the costs of its arbitrator and shall share equally the costs of the third arbitrator and of the arbitration process.

In the event you prevail in the arbitration and we promptly offer to you arbitration costs and reasonable attorney's fees incurred in connection therewith, in addition to the disputed contract benefit, you shall have no right to sue us for breach of implied covenants or unreasonable withholding of contract benefits.

To the extent that we prevail in the arbitration, the arbitrators may award us any "Claims Expenses" and/or "Damages" incurred or paid under reservation of rights in excess of our contract obligations as determined by the arbitrators.

In Witness Whereof, we have caused the President and Secretary to execute and attest these presents; but this policy shall not be valid unless countersigned in accordance with state law by a duly authorized representative of this Company.


**SECRETARY**                                              **PRESIDENT**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MINIMUM POLICY PREMIUM

This endorsement modifies and amends insurance provided under the following:

ALL COVERAGE PARTS

This endorsement sets forth the minimum earned premium for the policy.  The minimum earned premium for this policy is calculated in accordance with the following:

1.  The minimum earned premium for the policy period is the total policy premium as shown on the policy declarations page plus any premium adjustment by endorsements and any additional premium developed by audit.

2.  Audits that indicate a return premium will not reduce the minimum as stated in paragraph (1).

3.  If the insured cancels this policy and the policy is not subject to audit, the return premium will be 90% of the unearned policy premium; however in no event will the Company retain less than **25%** of the minimum earned premium shown in 1. above.

4.  If the insured cancels this policy and the policy is subject to audit, the earned premium will be determined by final audit, however in no event will it be less than the minimum earned premium as described in #1 above.

5.  If the Company cancels the policy for any reason, other than for non-payment of premium, then the insured will be returned the full amount of the unearned premium without any minimum premium restrictions.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

AP2103US 05-04                      Page 1 of 1

# James River Insurance Company
## Privacy Policy

**We do not sell customer information to nonaffiliated third parties, and we do not share customer information with nonaffiliated third parties except those parties who perform contractual services for us, and parties to which we are authorized to provide information by law.** In addition, when we provide information to affiliates or non-affiliates, we limit those disclosures to information about your transactions and experiences with us and to disclosures otherwise permitted by law. You do not need to take any action to prevent us from selling or sharing information we obtain about you.

**We use security measures and training in our effort to protect the customer information we collect.** We protect the information we obtain about you by maintaining physical, electronic and procedural safeguards.

**We collect the following types of information about you when you purchase or use our products and services.** Most of the information that we obtain about you comes directly from you, such as through the insurance applications you submit when requesting insurance products. These applications and other inquiries we make of you allow us to learn information that we may use to contact you in the future, such as your name, address, telephone number and e-mail address. In addition, insurance applications and other information you provide enables us to determine the type and value of your insured property, the types of insurance coverages you have or in which you might be interested, and similar information.

If you visit an Internet site that we maintain, we might request or obtain information that will enable us to identify you as a registered user, such as your name, a user identification name, a password, password reminders, and your Internet service provider. We might use a "cookie" to retain some of this information. We also might obtain information about your operating system, web browser and similar information to enable us to improve the operation of our site.

When we consider products and services in which you may be interested, we often review information that we have about your past transactions with us or our affiliates, such as your existing or former policy coverages, premiums and payment history. In addition, we may learn information about your transactions with nonaffiliated third parties, including the types of products or services you obtained from them and your experiences with them. Finally, we may obtain other information from third parties that has a bearing upon your eligibility for the products or services you seek from us. This information may include your credit report or information about your creditworthiness, or other information maintained by consumer reporting agencies.

**We provide customer information only to our affiliates and to nonaffiliates that must protect your customer information.**

**We also may provide information as mentioned in this notice to nonaffiliated third parties that perform services for us or perform functions on our behalf, such as marketing and research, or to other financial institutions with which we have joint agreements for activities such as marketing. By law, our contracts with these parties must prevent them from using the information they receive about you except as described in this notice.**

Finally, we may share customer information as permitted by applicable law. This means that we will share information with parties as necessary to affect, administer, or enforce transactions that you request. For example, we might provide information to a company that processes, prints and mails our insurance policies to you, or to a company that adjusts claims under your policies. We also might disclose customer information to other entities specified by law, such as insurance advisory organizations, our attorneys and accountants, consumer reporting agencies, or civil and regulatory authorities. Federal law sets the limitations on these types of disclosures.

**We strive to keep our records as accurate as possible.** We attempt to maintain accurate records about you and we will gladly make appropriate corrections when you notify us. Of course, we do not control the accuracy of information gathered and provided by third parties, and you may need to notify third parties directly if you believe that any information we received from them is inaccurate. You may request the name and address of any consumer-reporting agency from which we obtain a report on you. You then may contact that consumer-reporting agency to request a copy of the report it makes or to advise of any changes to the information they maintain and report.

We will provide one copy of this Privacy Policy to joint contract holders. Please share this information with everyone covered under your policy or contract.

AP0100US 04-03

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TERRORISM EXCLUSION

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

The coverage under this policy does not apply to any loss, injury, claim or damage arising directly or indirectly out of or relating to:

1. Any act of "terrorism"; or
2. Any action authorized by a government authority or agency for the purpose of preventing or minimizing the consequences of any act or threat of "terrorism".

"Terrorism" means an activity by an individual acting alone, or individuals acting as a part of a group, that involves any violent act, including the threat of any activity or preparation for an activity that:

1. Causes either:

   a. Damage to property;

   b. Injury to person(s); or

   c. Loss of income or increased expense; and

2. Appears to be intended to:

   a. Intimidate or coerce a civilian population;

   b. Disrupt any segment of an economy;

   c. Influence the policy of a government by intimidation or coercion;

   d. Affect the conduct of a government by destruction, assassination, kidnapping or hostage-taking; or

   e. Advance a political, religious or ideological cause; or

3. Involves the use, release, dispersal, discharge, escape or application of:
   a. Nuclear materials, or directly results in nuclear reaction or radiation or radioactive contamination; or

   b. Pathogenic or poisonous biological or chemical materials.

"Terrorism" shall also include any incident determined to be such by any official, department or agency that has been specifically authorized by federal statute to make such a determination.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

AP2112US 08-04                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SERVICE OF SUIT

This endorsement modifies and amends insurance provided under the following:

ALL COVERAGE PARTS

It is agreed that in the event of the failure of this Company hereon to pay any amount claimed to be due hereunder, this Company hereon, at the request of the Insured, will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made upon the Company's President, or his nominee, at 7130 Glen Forest Drive, Suite 210, Richmond, Virginia, 23226 and that in any suit instituted against any one of them upon this Policy, this Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named is authorized and directed to accept service of process on behalf of this Company in any such suit and or upon the request of the Insured to give a written undertaking to the Insured that it or they will enter a general appearance upon this Company's behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States of America, which makes provision therefore, this Company hereon hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designate the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

AP2113US 07 03                                      1 of 1

IL 00 21 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

© ISO Properties, Inc., 2001

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

    **(a)** Any "nuclear reactor";

    **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

    **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2001
IL 00 21 07 02

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# COMBINED GENERAL ENDORSEMENT

1. **ABSOLUTE ASBESTOS, LEAD OR SILICA DUST - EXCLUSION**

   Injury or damages, including any claim or suit, arising out of, resulting from, caused or contributed to by Asbestos, Lead or Silica Dust is not covered under this policy, nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising or alleged to have arisen out of same, including but not limited to any:

   a. Loss, damage, cost, liability or expense of any type, arising out of the inhalation, ingestion, physical exposure to, absorption of, or toxic substances of or from Asbestos, Lead or Silica Dust in any form, or from any goods, products or structures containing same, or "Property Damage" or devaluation of property arising from any form of same; or

   b. Existence of Asbestos, Lead, or Silica Dust, in any form, in occupancy or construction, or the manufacture, sale, transportation, handling, storage, disposal, or removal of same, or goods or products containing same; or

   c. Loss, cost, expense, fines and/or penalties arising out of any (1) request, demand, order, governmental authority or directive or that of any private party or citizen action that any Insured, or others, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of Asbestos, Lead, or Silica Dust, or (2) any litigation or administrative procedure in which any Insured or others may be involved as a party in response to the effects or alleged effects of Asbestos, Lead, or Silica Dust; or

   d. Any supervision, instructions, recommendations, requests, warnings or advice given or which should have been given, as well as any costs, including but not limited to abatement, mitigation, removal, containment, treatment, detoxification, neutralization, or disposal of same or in any way respond to or assess the effects of same; or

   e. Actual or alleged Asbestosis, Lead paint poisoning, Silicosis or any other similar condition.

   This exclusion applies regardless of whether:

   a. An alleged cause for the injury or damage is the Insured's negligent hiring, placement, training, supervision, retention, or wrongful act.

2. **ABSOLUTE POLLUTION AND POLLUTION RELATED LIABILITY - EXCLUSION**

   Pollution/environmental impairment/contamination is not covered under this policy, nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising out of or alleged to have arisen out of same. All liability and expense arising out of or related to any form of pollution, whether intentional or otherwise and whether or not any resulting injury, damage, devaluation, cost or expense is expected by any Insured or any other person or entity is excluded throughout this policy.

   This insurance does not apply to any damages, claim, or suit arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" including but not limited to any:

   a. Any loss, damage, cost, liability or expense of any type for the devaluation of property, or for taking, use or acquisition or interference with the rights of others in or on property or air space, or any other type injury or expense; or

   b. Any loss, cost, expense, fines and/or penalties arising out of any (1) request, demand, order,

governmental authority or directive or that of any private party or citizen action that any Insured, or others, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess same, the effects of pollutants, environmental impairments, contaminants or (2) any litigation or administrative procedure in which any Insured or others may be involved as a party as a result of actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or placement of pollutants, environmental impairments, or contaminants into or upon land, premises, buildings, the atmosphere, any water course, body of water, aquifer or ground water, whether sudden, accidental or gradual in nature or not, and regardless of when.

"Pollutants" mean any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals or "waste". "Waste" includes medical waste, biological infectants, and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

This exclusion applies regardless of whether:

1.  An alleged cause for the injury or damage is the Insured's negligent hiring, placement, training, supervision, retention, or, wrongful act.

## 3.  DUTY TO DEFEND

Where there is no coverage under this policy, there is no duty to defend.

## 4.  EMPLOYER'S LIABILITY – EXCLUSION

This insurance does not apply to any claim, suit, cost or expense arising out of "Bodily Injury" to:

a.  Any employee of a Named Insured arising out of and in the course of:

(1)  Employment by the Insured; or,

(2)  While performing duties related to the conduct of the Insured's business; or

b.  The spouse, child, parent, brother, sister or relative of that employee as a consequence of Paragraph 1 above.

This exclusion applies:

a.  Whether an Insured may be liable as an employer or in any other capacity; and/or,

b.  To any obligation to share damages with or repay someone else who must pay damages because of the injury; and/or,

c.  To liability assumed under any "Insured Contract."

Wherever the word "employee" appears above, it shall mean any member, associate, "leased worker", "temporary worker" or any person or persons loaned to or volunteering services to you.

## 5.  EMPLOYMENT-RELATED PRACTICES - EXCLUSION

Employment-Related Practices, regardless of allegations, are not covered under this policy nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same, including but not limited to:

a.  Refusal to employ any person or termination of employment of any person; or

b.  Any employment-related practices, policies, acts or omissions, including but not limited to coercion, demotion, evaluation, reassignment, discipline, defamation, harassment in any form, humiliation, or discrimination; or

    c.  Consequential "Bodily Injury" or "Personal and Advertising Injury" as a result of 1. or 2.; or

    d.  Discrimination charges, of any kind, actual and alleged, are not covered under this policy, nor are any expenses or obligation to share damages with or repay another whom must pay from same.

## 6.  WAR RISK - EXCLUSION

This Company shall not be liable for loss caused directly or indirectly by:

    a.  Hostile or warlike action in time of peace or war, including any action in hindering, combating or defending against an actual, impending or expected attack by:

        (1)  Any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or

        (2)  Military, naval or air forces; or

        (3)  An agent of such government, power, authority or forces, it being understood that any discharge, explosion or use of any weapon of war employing nuclear fission of fusion shall be conclusively presumed to be such hostile or warlike action by such a government, power, authority or forces.

    b.  Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence.

## 7.  TERMS, CONDITIONS AND PREMIUM

On each renewal, continuation, anniversary of the effective date of the policy or on an annual basis, the Company will determine the rate and premium and/or amend the terms and conditions in accordance with the rates and rules then in effect.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AWARENESS PROVISION

If during the "policy period" the "Insured" shall become aware of any "wrongful act" that may reasonably be expected to be the basis of a "claim" against the "Insured" and if the "Insured" shall during the "policy period" give written notice to the Company of such "wrongful act" and the reason for anticipating a "claim", including but not limited to the:

1. Specific "wrongful act";
2. "Damages" which have or may result from such "wrongful act"; and
3. Circumstances by which the "Insured first became aware of such "wrongful act"

then any such "claim" that may subsequently be made against the "Insured" arising out of such "wrongful act" shall be deemed for the purposes of this insurance to have been made during the "policy period."

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PRIOR AND PENDING LITIGATION EXCLUSION

| SCHEDULE |
|---|
| Date <u>04/11/2004</u> |

This policy does not apply to any "Claim Expenses" or "Damages" by reason of any litigation against any Insured pending on or prior to the date shown in the above Schedule.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**EXHIBIT "B"**



| JAMES RIVER GROUP | **James River Insurance Company**<br>7130 Glen Forest Drive, Suite 210<br>Richmond, VA 23226<br>804-289-2700 | **Application for Law Firms Lawyers' Professional Liability**<br><br>**PROFESSIONAL LIABILITY Division**<br>Email to PL@jamesriverins.com or,<br>Fax to 804-287-2816 |
|---|---|---|

**APPLICANT'S INSTRUCTIONS:**
1. Answer all questions completely. Please attach extra sheets as required. Incomplete or illegible applications may be discarded.
2. Application must be signed and dated by the owner, partner, or officer not earlier than 45 days before the proposed effective date of coverage.
3. Please read the statements at the end of this application carefully. Thank you!

## PROFESSIONAL LIABILITY INSURANCE APPLICATION FOR LAW FIRMS

Firm Name: <u>Law Offices of James J. Seltzer</u>    Contact Name: <u>JAMES JAY SELTZER</u>
Street Address: <u>3300 Powell Street, Suite 201</u>    City: <u>Emeryville</u>    State: <u>CA</u>
Zip Code: <u>94608</u>    County: <u>ALAMEDA</u>    Phone: <u>510-596-2500</u> Fax: <u>510-596-2519</u>
Mailing Address: _____    City: _____ State: _____
Zip Code: _____
Email: <u>LAWOFFICES@JJSELTZER.COM</u>
Limits Requested: <u>$1M/1M</u>    Deductible Requested: <u>$50,000</u>    Effective Date: <u>4/11/06</u>

Firm Profile:
Complete the Schedule of Lawyers section of the application and supply a current sample of firm letterhead.
Number of: <u>5</u> Attorneys <u>0</u> Of Counsel _____ Independent Contractors (lawyers) _____ Clerks
<u>1</u> Paralegals _____ Legal Secretaries <u>1</u> Law Clerks <u>3</u> Office Administrators _____ Other

1. On what date was your firm established? _____ <u>1973</u>

2. Has your firms name changes?   Yes ☐ No ☑ If "Yes", complete Predecessor Firms section on Page 6 of 6.

3. Has your firm assumed, by merger or acquisition, the liabilities of another lawyer or law firm? If "Yes", provide a detailed narrative. <u>NO.</u>

4. Does your firm share office space with another firm?    Yes ☐ No ☑
   a. Letterhead    ☐ Yes ☒ No
   b. Support Staff ☒ Yes ☐ No    SEE ATTACHED
   c. Cases    ☒ Yes ☐ No
   If "Yes", provide a detailed narrative.

5. In the last 12 months, how many attorneys have joined the firm <u>1</u> departed from the firm? <u>0</u>

6. What was your firm's revenue for the last 12 months? <u>$3.1M</u> in the 12 months before that? <u>$2M</u>

7. List the earliest date from which you have had uninterrupted "claims made" coverage. _____

8. Has our firm or predecessor firm ever had a gap in coverage? ☐ Yes ☑ No
   If "Yes", please provide detailed narrative.

9. Does your current policy include a prior acts exclusion or retroactive date? ☑ Yes ☐ No
   Retroactive Date: <u>4/11/02</u>
   If "Yes", please provide the endorsement or the Declarations page that documents this date.

JRAP0066    Page 1 of 4    © James River Insurance Co. 2004

January 10, 2006

James River Group
Professional Liability Insurance Application for Law Firms


No. 4:  Our firm does not share office space or letterhead with another firm.  However, we do share the services of an attorney with the Law Offices of Alan W. Sparer (San Francisco, CA).  The attorney actively works on shared cases with Mr. Sparer's office and works from Mr. Spare's office.

10. Please provide the following information about your professional liability insurance for the previous 5 years.

| Company | Policy Period | Limits/Deductible | Premium | No. of Attorneys |
|---|---|---|---|---|
| PLEASE SEE ATTACHED | | | | |
| | | | | |
| | | | | |
| | | | | |

11. Describe your firm's system of calendar control and maintenance.
WE HAVE A PC BASED CALENDAR SYSTEM. UPDATE EVERY WEEK. ALSO A HAND WRITTEN CALENDAR UPDATED DAILY. ATTORNEYS ALSO KEEP THEIR OWN PERSONAL CALENDARS.

12. Describe your firm's system for identifying and avoiding conflicts of interest.
WE HAVE AN EXTENSIVE DATABASE, (PC) THAT WARNS US IF A CONFLICT IN CLIENT NAME/ COMPANY OCCURS.

13. Does your firm have a written Risk Management Program? ☐ Yes ☑ No
How is it enforced?

14. Client Communications (Check all that apply and indicate percentage of use):
☐ Engagement letters on new matters presented to the firm          Estimate __100__%

Do they clearly define who is being represented?          ☑ Yes ☐ No
Do they define service to be performed?          ☑ Yes ☐ No
Do they describe billing rate and procedures?          ☑ Yes ☐ No
Do you audit files to make sure they are used by attorneys?          ☐ Yes ☑ No

☐ Written fee agreement outlining the firm's billing procedures          _____%
☑ Declination or non-engagement letters on new matters that will not be undertaken          __100__%
☐ Scope of service letters or engagement letters for new matters of existing clients          _____%
☐ Settlement Authority letters (when applicable)          _____%
☐ Termination or disengagement letters when completing or terminating representation          _____%

15. Approximately, what was the single highest value case the firm handled in the last 12 months?          1,485,000

16. Please provide the percentage of each area of practice your firm engages in. Note the combined total of your practice areas must equal 100%. For each area of practice your firm engages in that is referenced by an *, please complete the appropriate supplement.

| | | | | | |
|---|---|---|---|---|---|
| _5_% | Administrative Law | ___% | Domestic Relations | ___% | Oil & Gas |
| ___% | Admiralty Law | ___% | Environmental Law | ___% | Personal Injury-Plaintiff |
| ___% | Bankruptcy | ___% | Entertainment | ___% | Personal Injury-Defense |
| ___% | Business Transaction/Contract | ___% | ERISA/Employee Benefits | ___% | Residential Real Estate |
| ___% | Civil Rights | ___% | Estate, Trust, Probate | ___% | Commercial Real Estate |
| ___% | Consumer Debt | ___% | Financial Institution | ___% | Securities |

M.A.S.D PLAINTIFF 95%

34

# Policy Addendum

Client: James Jay Seltzer

| Carrier | Policy # | Effective | Expiration | Limits | Deductible | Premium | Attys Covered |
|---------|----------|-----------|------------|--------|------------|---------|---------------|
| James River Specialty Insurance Company | 00003944-1 | 4/11/05 | 4/11/06 | 1M/1M | $50,000 | $67,500.00 | 4 |
| James River Specialty Insurance Company | 00003944-0 | 4/11/04 | 4/11/05 | 1M/1M | $50,000 | $67,500.00 | 4 |
| Lloyds of Lmdon via Robert Fleming (UK) Limited | 750/FR03/4601/000 | 4/11/03 | 4/11/04 | 1M/1M | $50,000 | $75,000.00 | 4 |
| Evanston Insurance Company | LA-801867 | 4/11/02 | 4/11/03 | 1M/1M | $10,000 | $50,544.00 | 3 |
| American First Insurance Company | 013FLL001089 | 2/15/02 | 4/11/02 | 500/1M | $15,000 | $1,266.00 | 3 |
| American First Insurance Company | 013FLL001089 | 2/15/01 | 2/15/02 | 500/1M | $15,000 | $71,594.00 | 3 |

| | | | | | |
|---|---|---|---|---|---|
| ___% | Collection | ___% | Banking | | |
| ___% | Commercial Litigation-Plaintiff | ___% | Government Contracts/Claims | ___% | Tax |
| ___% | Commercial Litigation — Defense | ___% | Immigration & Naturalization | ___% | Workers Compensation – Defense |
| ___% | Construction/Building Contracts | ___% | Insurance Defense | ___% | Workers Compensation – Plaintiff |
| ___% | Corporate Administrative | 99 % | Intellectual Property* | ___% | Other |
| ___% | Corporate & Business Organization | ___% | International Law^ | ___% | PLAINTIFF SECURITIES Other |
| ___% | Corporate Mergers & Acquisitions | ___% | Labor Management | | |
| 1 % | Criminal | ___% | Labor Union/Employees | | |
| ___% | Mass Tort/Class Actions | | | | |

17. Does any one client account for 10% or more of your firms annual billings? If "Yes", please name the client(s) and is it the services your firm provided them. ☐ Yes ☑ No

_____

_____

18. In the past 5 years, has your firm or any lawyer in your firm represented issuers, underwriters, or affiliates of either with regard to the issuance offering or sale of securities or bonds? ☐ Yes ☒ No If "Yes", please complete the Securities supplement.

19. In the past 3 years has any attorney in your firm served as a Director, Officer, Trustee, Partner, or Employee of any clients of the firm?   ☐ Yes ☑ No If "Yes", please complete the Outside Interest supplement.

20. Do any of your attorneys have a financial interest in a client of the firm?   ☐ Yes ☑ No If "Yes", please complete the Outside Interest supplement.

21. Does anyone affiliated with your firm maintain any equity interest in a Title Agency? ☐ Yes ☑ No

22. In the past 5 years, has anyone in your firm served as a Director, Officer, Trustee, Partner, or Employee of a Financial Institution?   ☐ Yes ☑ No If "Yes", please complete the Outside Interest Supplement.

23. In the past 3 years, has any attorney in your firm handled class action or mass tort litigation? ☐ Yes ☑ No If "Yes", please provide a narrative describing the class action or the mass tort litigation, the capacity in which your attorney was involved in the case, the size of the class, and the amount of money involved.

24. Please describe your firm's policy regarding collection of your fees from clients.
FIXED FEE RETAINERS ARE COLLECTED FROM CLIENT UPON SIGNING OF ENGAGEMENT FORM. CONTINGENCY FEES ARE COLLECTED AT THE CONCLUSION OF A CASE. SLIP BASED CLIENTS ARE BILLED BASED UPON ATTORNEY'S REQUEST OR AS FUNDS ARE NEEDED.

25. a. In the past 3 years, how many times have you sued or entered into arbitration with your clients to collect your fees. _____-0-_____

   b. In the past year, how many outstanding clients bills have you sent to a collection agency. _____-0-_____

JRAP0066                      Page 3 of 4              © James River Insurance Co. 2004

LAW OFFICES OF

# JAMES JAY SELTZER

JAMES JAY SELTZER
ALSO A MEMBER OF NEW YORK BAR DC BAR

MONTEREY OFFICE
TEL (831) 640-5766

3300 POWELL STREET
SUITE 201
EMERYVILLE, CALIFORNIA 94608
FACSIMILE (510) 596-2519
TELEPHONE (510) 596-2500
E-MAIL lawoffices@jjseltzer.com

January 10, 2006

To Whom It May Concern:

The Law Offices of James Jay Seltzer is financially stable as a fully operating law firm specializing in Securities and licensing matters.

Our income is based on retainer fees and proceeds from settlements and awards.

Thank you,

Lashini Mathews
Office Manager

26. Does any member of your firm currently suffer from an impairment that might hinder their professional ability to provide competent, courteous, and timely legal services?    ☐ Yes ☑ No
    If "Yes", please describe the impairment.
    _____

27. If you are a sole practitioner, who will handle your cases in the event of your incapacitation or vacation?
    N/A
    _____

28. In the past 5 years, has any attorney associated with your firm been the subject of a disciplinary action? ☐ Yes ☑ No If "Yes", please complete a Claims supplement.

29. In the past 5 years, how many claims have been alleged against attorneys in your firm (past and present)? __2__ For each, please complete a Claims supplement.

30. Are you or any member of your firm aware of any incident, act, error or omission that may result in a claim or disciplinary action being brought against you, which you have not mentioned in questions 28 or 29? ☐ Yes ☑ No If "Yes", please complete a supplement. Will you report his to your insurer? ☐ Yes ☐ No
    Please note that any such matter will not be covered by a subsequently issued claims-made policy.

**NOTICE TO APPLICANT:** The coverage applied for is solely as stated in the policy. If policy is issued on a "CLAIMS MADE" or "CLAIMS MADE AND REPORTED" basis, it provides coverage only for those claims that are first made against the insured during the policy period unless the extended reporting period option is exercised in accordance with the terms of the policy. If issued on an "OCCURRENCE" basis, the policy provides coverage only for those occurrences that take place during the policy period.

The Insurer will rely upon this application and all such attachments in issuing the policy. If the information in this application or any attachment materially changes between the date this application is signed and the effective date of the policy, the Applicant will promptly notify the Insurer, who may modify or withdraw any outstanding quotation or agreement to bind coverage.

**In New York:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**In all other states:** It is a crime for any person to knowingly provide or facilitate in providing any false, incomplete, or misleading information to an insurance company. Penalties may include fines, imprisonment and denial of insurance benefits.

**WARRANTY:** I warrant to the Insurer, that I understand and accept the notice stated above and that the information contained herein is true and that it shall be the basis of the policy of insurance and deemed incorporated therein, should the Insurer evidence its acceptance of this application by issuance of a policy. I authorize the release of claim information from any prior insurer to James River Insurance Company, 7130 Glen Forest Drive, Richmond, VA 23226.

| | |
|---|---|
| Applicant: LAW OFFICES OF JAMES JAY SELTZER | Title: Owner |
| Applicant's Signature: | Date: |
| Agent/Broker Name: EGLOFF INSURANCE AGENCY, INC. | 3/10/2006 |

MAR-17-06   12:07PM   FROM-                                      T-119  P.008/031  F-965

## INSURED SUPPLEMENT
## APPLICATION FOR LAWYER'S PROFESSIONAL LIABILITY INSURANCE

Indicate the names of all lawyers who are presently officers, partners, employed lawyers, of counsels or retired partners of the Firm and complete the requested information for each lawyer.  **Please note that coverage responds only for acts performed on behalf of the firm.**

| Name of Lawyers | Designation<br>O - Officer<br>P - Partner<br>E - Employed Lawyers<br>OC - Of Counsel<br>RP - Retired Partner | Member of Management Committee or Governing Body (Yes/No) | Year Admitted to Bar | Years of Full-Time Practice | Specialty, if any | Member in Good Standing of the Following State Bar(s) |
|---|---|---|---|---|---|---|
| PLEASE SEE | | | | | | |
| ATTACHED | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

I/We understand information submitted herein becomes a part of my/our professional liability application and is subject to the same representations and conditions.

LAW OFFICES OF JAMES JAY SELTZER                    Owner
_____                 _____
Name of Applicant*                                  Title

                                                    3/10/2006
_____                 _____
Signature of Applicant                              Date

**\*MUST BE SIGNED BY A MEMBER OF THE FIRM'S MANAGEMENT COMMITTEE OR GOVERNING BODY.**

James River Insurance Company                          1
Lawyers Professional Liability Application

# Attorney Addendum

Client: James Jay Seltzer

Officer, Partner, Employed,
Sole Proprietor, Of Counsel

| Name | SS# | Date of Hire | Desig. | State Bar # | Bar Year | Years Full Time Pract | CLE Hrs Last 12 mos | Major Area of Practice Area | % of Time |
|------|-----|--------------|--------|-------------|----------|------------------------|---------------------|-----------------------------|-----------|
| Harrington, Michael Joseph | 680 50 0377 | 12/1/03 | E | 202515 | 1999 | 7 | | | % |
| Murphy, Timothy David | 350 38 8195 | 7/1/95 | E | 62226 | 1974 | 32 | | | % |
| Nabwangu, James | 501 21 1102 | | E | | 2005 | 1 | | | % |
| Porter, Thomas Harold | 536 72 7569 | 3/21/96 | E | 178998 | 1995 | 10 | | | % |
| Seltzer, James | 087 36 8694 | 5/1/73 | O | 54533 | 1972 | 34 | | | % |

Total CLE Hours, All Attys:

Number of Attys: 5

40



| | James River Insurance Company | Supplemental Claim Form Lawyers |
|---|---|---|
| JAMES RIVER GROUP | 7130 Glen Forest Drive, Suite 210<br>Richmond, VA 23226<br>804-289-2700 | PROFESSIONAL LIABILITY Division<br>Email to PL@jamesriverins.com or,<br>Fax to 804-287-2816 |

**APPLICANT'S INSTRUCTIONS:**

1. Answer all questions completely. Please attach extra sheets as required. Incomplete or illegible applications may be discarded.
2. Complete one form for each claim or incident.
3. If claim is still open, attach copy of complaint and responsive pleadings.

## SUPPLEMENTAL CLAIM FORM LAWYERS

Claim Information

1. Full Name of Applicant Firm:   LAW OFFICES OF JAMES JAY SELTZER
2. Full Name of Individual(s) of firm involved in the claim:
   JAMES JAY SELTZER

3. Full Name of Claimant: RONALD JACKSON, ETAL
4. Is this a Claim/Suit ☒ or Incident ☐  4a. Have you notified your insurance carrier in writing?
   Yes ☒ No ☐
5. Date of Alleged Error: _____  5a. Date of Claim:  DATE REPORTED: 8/21/02
6. Name of Insurance Company Handling: ____ EVANSTON
7. Additional defendants:  PLEASE SEE ATTACHED

8. If closed: Date Claim was paid and close: *$16,000 /$91,090.82 COSTS
   Total Loss Paid including Deductible: $___*___   ☒ Court Judgment ☐ Out of Court
                                         CASE DISMISSED         Settlement
9. If pending: Claimant's Settlement Demand: $_____ Defendant's Offer For Settlement $_____
10. Description of claim: (Provide enough information to allow evaluation)
    PLEASE SEE ATTACHED

    a. Alleged act, error or omission upon which Claimant bases claim:
    PLEASE SEE ATTACHED

    b. Description of case and events:
    PLEASE SEE ATTACHED

    c. Description of type and extent of injury or damage allegedly sustained:
    PLEASE SEE ATTACHED.

11. What steps have the firm and the attorney taken to prevent similar allegations in the future?

I understand information submitted herein becomes a part of my Professional Liability Application and is subject to the same terms and conditions.

Applicant Signature: _____   Title: Owner   Date: 3/10/2006
JRAP0061                          Page 1 of 1            © James River Insurance Co. 2004

41

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
CASE NO:  02-CV-60699-MARRA/Lynch

RONALD JACKSON, SHEKINA
DELLMAR-DONALDSON, JAN HARRIS,
BRENDA OLIVER, ROBBIE WATSON,
MARY EDMONDS, and ANN WOFFORD,

            Plaintiffs,

v.

BARRY MANDELKORN, RUDEN McCLOSKEY,
SMITH SCHUSTER and RUSSELL, P.A., BRIAN
NEIMAN a/k/a BRIAN ACHERMAN, JAMES
SELTZER, JOHNATHAN COLBY, ROOSEVELT
WALTERS, BELLSOUTH TELECOMMUNICATIONS,
INC. d/b/a BELLSOUTH, BELLSOUTH CORPORATION,
FRANCES B. SEMMES, SAUL SMOLAR, KEITH W.
KOCHLER, VALERIE SHEA, RICHARD GORDON,
HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.,

            Defendants.
_____/

Redacted (Privacy; Confidential)



Redacted (Privacy; Confidential)

2

43



Redacted (Privacy; Confidential)

3

MAR-17-06    12:09PM    FROM-
T-119    P.015/031    F-965

Redacted (Privacy; Confidential)

MAR-17-06  12:09PM  FROM-                                    T-119  P.016/031  F-965

Redacted (Privacy; Confidential)

5

MAR-17-06   12:09PM   FROM-                                    T-119   P.017/031   F-965

Redacted (Privacy; Confidential)

6

Redacted (Privacy; Confidential)

7

MAR-17-06  12:10PM  FROM-                                    T-119  P.019/031  F-965



| JAMES RIVER GROUP | James River Insurance Company 7130 Glen Forest Drive, Suite 210 Richmond, VA 23226 804-289-2700 | Supplemental Claim Form Lawyers |
|---|---|---|
| | | PROFESSIONAL LIABILITY Division Email to PL@jamesriverins.com or, Fax to 804-287-2816 |

**APPLICANT'S INSTRUCTIONS:**

1. Answer all questions completely. Please attach extra sheets as required. Incomplete or illegible applications may be discarded.
2. Complete one form for each claim or incident.
3. If claim is still open, attach copy of complaint and responsive pleadings.

## SUPPLEMENTAL CLAIM FORM LAWYERS

Claim Information

1. Full Name of Applicant Firm:  LAW OFFICES OF JAMES JAY SELTZER
2. Full Name of individual(s) of firm involved in the claim:
   JAMES SELTZER

3. Full Name of Claimant:  DR. FELIX PRAKASAM
4. Is this a Claim/Suit ☐ or Incident ☒  4a. Have you notified your insurance carrier in writing?
                                              Yes ☒  No ☐
5. Date of Alleged Error: _____  5a. Date of Claim:  REPORTED:  10/24/05
6. Name of Insurance Company Handling:  JAMES RIVER
7. Additional defendants:

8. If closed:  Date Claim was paid and close: _____
   Total Loss Paid Including Deductible: $_____  ☐ Court Judgment  ☐ Out of Court Settlement
9. If pending: Claimant's Settlement Demand: $_____  Defendant's Offer For Settlement $_____
10. Description of claim:  (Provide enough information to allow evaluation)
    REGARDING THE REVOCATION OF CLAIMANT'S DEA LICENSE.

    a. Alleged act, error or omission upon which Claimant bases claim:
       UNTIMELY FILED APPEAL.

    b. Description of case and events:
       THIS MATTER IS CURRENTLY IN REVIEW WITH HENSHAW CULBERTSON.  PLEASE
       CONTACT THEIR OFFICES AT (415) 362-6000.
    c. Description of type and extent of injury or damage allegedly sustained:

11. What steps have the firm and the attorney taken to prevent similar allegations in the future?

I understand information submitted herein becomes a part of my Professional Liability Application and is subject to the same terms and conditions.

Applicant Signature: _____  Title: Owner  Date: 3/10/2006

JRAP0061                  Page 1 of 1              © James River Insurance Co. 2004

49

MAR-17-06  12:10PM  FROM-                                                              T-119  P.020/031  F-965

LAW OFFICES OF

# JAMES JAY SELTZER

JAMES JAY SELTZER
ALSO A MEMBER OF NEW YORK BAR DC BAR

MONTEREY OFFICE
TEL (831) 649-5700

3300 POWELL STREET
SUITE 201
EMERYVILLE, CALIFORNIA 94608
FACSIMILE (510) 596-2519
TELEPHONE (510) 596-2500
E-MAIL lawoffices@jjseltzer.com

October 17, 2005

James River Insurance Company
7130 Glen Forest Drive, Suite 210
Richmond, VA 23226-3754

Re:     *Prakasam v. Seltzer, Murphy, et al.*
        Case No.:     Not Filed

Dear Sirs:

Please find enclosed, copies of correspondence recently received from and pertaining to, our client Dr. Felix Prakasam. An appeal to which he may have been entitled concerning the revocation of his DEA drug license, was untimely filed.

Please review the enclosures and advise us of your assigned file number, as well as of any additional documentation you may require.

Your attention to this matter is sincerely appreciated.

Very truly yours,

Timothy D. Murphy
The Law Offices of James Jay Seltzer

enc.

cc:     Debra L. Mondragon, Senior V.P.
        Egloff Insurance Agency, Inc.
        20635 Ventura Boulevard
        Woodland Hills, CA 91364

3592.03.carrier10-17-05.doc

RECEIVED

OCT 2 1 2005

EGLOFF INSURANCE

50

MAR-17-06   12:10PM   FROM-                       T-119   P.021/031   F-965

3593-01

July 8, 2005

Jim,

Dr. Prakasam called me twice today. He said you told him there was a fax from the DEA stating that we had until August to file an appeal. He wanted me to fax it to him. I declined by saying that I didn't think it was one he was looking for and that I would rather wait until I talk to you or Tim. Tim told me not to send him anything.

I am sending you the fax in question. I do not see anything in it that mentions an August date.

Tim had alerted me that this fax would be coming on June 27 and to set it aside for him. When I received it I immediately pointed it out to Margaret and she informed Tim that we had it. She asked him if he would like it to be sent to him via Federal Express, he said no and to just set it aside.

Tim now says that we have a serious problem.

Dr. Prakasam's numbers are:

831-757-6445 ®

831-422-4884 (B)

Ann

Source: Legal > Federal Legal - U.S. > FR - Federal Register [i]
Terms: prakasam and dea (Edit Search)

FROM: ROBERT WALKER
DEA - OFFICE OF
CHIEF COUNSEL
(510) 592-2519

70 FR 33203, *

FEDERAL REGISTER

Vol. 70, No. 108

Notices

DEPARTMENT OF JUSTICE (DOJ)

Drug Enforcement Administration (DEA)

[Docket No. 02-28]

Felix K. Prakasam, M.D. Revocation of Registration

70 FR 33203

DATE: Tuesday, June 7, 2005

On February 6, 2002, the Deputy Assistant Administrator, Office of Diversion Control, Drug Enforcement Administration (DEA), issued an Order to Show Cause to Felix K. Prakasam, M.D. (Respondent) notifying Respondent of an opportunity to show cause as to why DEA should not revoke his DEA Certificates of Registration BP3420344 and BP44160029, pursuant to 21 U.S.C. 824(a)(1) and (a)(4) on the grounds he had materially falsified four DEA renewal applications and that his continued registration would be inconsistent with the public interest, as that term is used in 21 U.S.C. 823(f) and 824(a)(4). The Order to Show Cause also proposed that any pending applications for renewal should be denied under 21 U.S.C. 823(f).

The Order to Show Cause alleged, in sum, that during 1995-1996, Respondent failed to maintain complete and accurate records of controlled substances dispensed at this medical offices located in Redlands and Salinas, California, and accountability audits during this period revealed overages and shortages of controlled substances at both registered locations. As a result, on March 10, 1997, after an informal administrative hearing at the DEA San Francisco office, Respondent entered into a Memorandum of Understanding with DEA in which he agreed to address the record-keeping violations and provide effective controls against theft and diversion of controlled substances.

The Order to Show Cause further alleged that on April 30, 1997, the California Medical Board (California Board) brought on Accusation against Respondent's California medical license. As a result, on February 11, 1998, the California Board revoked Respondent's medical license, effective March 13, 1998. However, the Board stayed the revocation, placing Respondent's license on probation for three years, with conditions. On March 20, 2001, as a result of the California action, Respondent entered into a Consent Order with the Louisiana State Board of Medical Examiners (Louisiana Board) in which he agreed to an indefinite suspension of his Louisiana medical license.

Finally, it was alleged that in February 1998 and February 2001, Respondent materially falsified a total of four applications for renewal of his DEA registrations by failing to disclose the California Board's action placing his medical license in a probationary status.

https://www.lexis.com/research/retrieve?_m=4a03f5e2754be2ea2fc6f9ad009dcf50&csvc=...    6/27/2005

Respondent requested a hearing on the issues raised by the Order to Show Cause and following pre-hearing procedures, a hearing was held in San Francisco, California, on March 12 and 13, 2003. At the hearing, both parties called witnesses to testify and introduced documentary evidence. After the hearing, both parties submitted proposed findings of fact, conclusions of law, and argument.

On January 30, 2004, Presiding Administrative Law Judge Mary Ellen Bittner (Judge Bittner/ALJ) issued her Opinion and Recommended Ruling, Findings of Fact, Conclusions of Law and Decision of the Administrative Law Judge (Opinion and Recommended Ruling) in which she recommended that Respondent's two DEA registrations be revoked and any pending applications for renewal denied. No exceptions were submitted by the parties, and on March 2, 2004, Judge Bittner transmitted the record of these proceedings to the then-Acting Deputy Administrator of DEA.

The Deputy Administrator has considered the record in its entirety and pursuant to 21 CFR 1316.67, hereby issues her final order based upon finding of fact and conclusions of law as hereinafter set forth.

The Deputy Administr    adopt    findin    f fact and r    comm    ion of the Adm   is   rative Law    s that    onden   DEA C   rtific   as of    strat    be revoked, n1

n1 In m     c    ny/de     rulin   mich d'   e imp s   r   ant f    s of fact or her    an f        on.     U r    ad f Go   me    id    ovided Respondent c    averal P    Re    of Im   stu... wh   nad br ., prepared by a    .U Diversion  vestigator on h    bar   an i    ,    y        y    Je    for   the nearing. Before testifying for the G    prnme    the c   prsons   . hc bu   us   used the reports to   nde    res    the   ts wa   made after the Diversion    ...     ing   ct   au   ow h   nding the ALJ's ruling, the Government declined to    de Re. onde    ports,    ending they were not n    sable under the rules and stat   s governing DE.   ministr   n hearings.    pages 168-169; Opinion and Recommended    n, page    1,

The reports appear to be Jencks Act material (18 U.S.C. 3500) and the Deputy Administrator has previously ruled that "pursuant to applicable law and regulations governing DEA administrative hearings, neither the principles of the Jencks decision nor the Jencks Act are applicable to these proceedings." See e.g., Branex Inc., 69 FR 8,682, 8,685 (2004) (Emphasis added) [Confirming predecessor Deputy Administrator's interlocutory decision that the Government is not required to supply a respondent at an administrative hearing, statements made and adopted by Government witnesses during their direct testimony.]

Applying the principles of Branex and its predecessors, which addressed evidentiary/discovery standards applicable to DEA administrative hearing and d    ' the Government's limited obligations to provide discovery befor   nd dur    ourse of hearings under the Administrative Procedures Act (5 J.S.C   ee(d)) and m    ations (21 CFr 1316.54-1316.59), the Deputy Administr    onciudes the Gov   m    correctly de.  red to provide Respondent the    . question here. See e.g., Nicholas A. Sychak, d.b.a. Me.   'Pharr    cR 75,959, 75,960-75,961 (2000) [No requirement for Government to    close potentially exculpatory information to respondents in DEA administrative hearings; Rosalind A. Cropper, M.D., 66 FR 41,040, 41,041 (2001) ["the Federal Rules of Evidence do not apply directly to these proceedings"].

The record before the Deputy Administrator shows Respondent received his medical degree in 1971 from Christian Medical College in Vellore, India. He interned and completed a residency in Maryland and in 1981 was licensed to practice in California. He also practiced medicine in Louisiana from an undetermined date until 1992, when he moved to California

and opened a practice in Redlands. He eventually began working in the Salinas office of Rinaldo Fong, M.D. and took over that practice when Dr. Fong was deported. Respondent has held DEA Certificate of Registration BP3420344 for the Redlands location since November 18, 1992, and DEA resignation BP4416029 for the Salinas office since May 8, 1995. While Respondent is Board eligible in anesthesiology, his specialty at all relevant times has been bariatric medicine *i.e.*, weight control.

In July 1996, after reports were received of Respondent's possible purchase of excessive quantities of controlled substances, DEA Diversion Investigators, accompanied by an investigator from the California Board, conducted an inspection and accountability audit at Respondent's Salinas office. The inspection revealed Respondent had not complied with multiple regulatory requirements, including failures: (1) Maintain an inventory of controlled substances as of a specific date and as of the opening or closing of business; (2) maintain [*33204] addresses of patients to whom Respondent directly dispensed controlled substances or the initials or name of the dispenser; (3) adequately document a return of controlled substances to a supplier; (4) document a transfer of controlled substances between his Redlands and Salinas offices; and (5) retain a purchase invoice.

An accountability audit performed in conjunction with the investigation in July 1996 indicated substantial overages of phentermine 30 mg. and 15 mg. and a substantial shortage of phentermine 37.5. However, Judge Bittner concluded the overages were most likely attributable to the use of a zero opening inventory and did not necessarily indicate diversion.

With regard to the shortage, there was a conflict in the evidence as to whether investigators had inventoried some 48,000 dosage units of phentermine 37.5 mg. which, if counted, would have resulted in an overage of that drug. A second inventory was performed at the Salinas Office on October 29 and 30, 1996, showing a substantial overage of phentermine 37.5 mg. and no significant shortages. Given the numbers, Judge Bittner concluded the second audit's overage indicated the 48,000 units of phentermine 37.5 mg. had actually been on hand in July, but not counted in the first audit.

The Deputy Administrator agrees with Judge Bittner that the record is inadequate to determine whether or not the July 1996 inventory was accurate. Therefore, it cannot be established whether or not Respondent was responsible for the shortage indicated by the first audit.

On February 6, 1997, a Notice of Hearing was issued by DEA informing Respondent an informal hearing would be held in San Francisco on March 10, 1997. The notice alleged the record keeping and regulatory violations from the 1996 DEA investigations. Respondent appeared, represented by counsel, and testified regarding the reasons for the regulatory violations, but disputed the accuracy of the inventories.

On May 8, 1997, Respondent executed a Memorandum of Understanding with DEA's San Francisco Field Division. In that Memorandum Respondent agreed to: (1) Comply with the provisions of the Controlled Substances Act and its implementing regulations at each of his registered locations; (2) take an inventory of controlled substances upon receiving a new DEA registration; (3) maintain dispensing logs that met regulatory requirements; (4) keep complete and accurate records; (5) keep required receiving records; (6) follow drug destruction procedures established by the DEA San Francisco office; and (7) provide effective controls against theft and diversion of controlled substances.

The California Board conducted additional investigations of Respondent and on April 30, 1997, issued an Accusation against Respondent alleging multiple violations, including the matters from the 1996 DEA inquiries. On February 11, 1998, the California Board issued a Decision, effective March 13, 1998, adopting a Stipulated Settlement and Decision (Stipulation) that Respondent and his then-attorney executed on January 5, 1998. In the

Stipulation, Respondent waived various rights but did not admit engaging in any of the alleged misconduct.

The Stipulation revoked Respondent's medical license and license to supervise physician assistants, but stayed the revocations and placed his licenses on probation for three years. Among its provisions, the Stipulation required Respondent to take continuing medical education courses and courses in prescribing practices and ethics, to maintain records of all controlled substances he prescribed, dispensed or administered, to make these records available for inspection, to take and pass an oral clinical examination, to have a third party present while examining or treating female patients and to comply with a probation surveillance program.

The Stipulation provided that upon successful completion of probation, Respondent's California licenses would be reinstated. That, in fact, occurred and on May 11, 2001, Respondent was notified he had successfully completed probation. He has since been licensed to practice medicine in California without restriction. The evidence introduced at the DEA hearing indicates that since the 1996 DEA inquiry, he has complied with controlled substance record keeping requirements.

Respondent was also licensed to practice medicine in Louisiana for a period of time prior to 1998, when his license expired. Under Louisiana law, he was entitled to renew the license for a period of four years from its expiration. On Februry 2, 2001, Respondent entered into a Consent Order with the Louisiana Board, in which the Board indefinitely suspended Respondent's entitlement to reinstatement of his Louisiana medical license. It further imposed, as a condition of eventual reinstatement, that Respondent successfully complete all probationary conditions levied by the California Board and obtain an unrestricted license to practice medicine in California. Respondent was also required to notify and appear before the Louisiana Board, prior to seeking renewal or reinstatement of his Louisiana license and he would accept any terms or conditions the Louisiana Board might impose as a condition of reinstatement.

Respondent testified at the DEA hearing that when he signed the Memorandum of Understanding with DEA in May 1997, he understood "that the matter would be laid to rest at that moment, and never again brought up; but it was not done so." He also testified he agreed to settle the California Board proceedings because he paid "thousands of dollars" in attorney fees and had no money left. However, he regretted that decision because he considered the allegations to be false. With regard to the Louisiana Consent Order, Respondent testified he signed it because he "had not desire to go back to Louisiana."

On February 25 and 28, 1998, Respondent executed renewal applications for the DEA registrations at his Redlands and Salinas locations. On both applications, Respondent checked "No" in response to the question, "Has the applicant ever been convicted of a crime in connection with controlled substances under State or Federal law or ever surrendered or had a Federal controlled substance registration revoked, suspended, restricted, or denied or ever had a State professional license or controlled substance registration revoked, suspended, denied, restricted, *or placed on probation or is any such action pending against the applicant?*" (Emphasis added). An applicant who responds affirmatively to this question is required to explain his answer on the back of the application. Respondent left this space blank on both applications.

On February 27 and 28, 2001, Respondent again executed renewal applications for his Salinas and Redlands offices. These applications included the so-called "liability questions" pertaining to individual applicants. Question 3(d) asked, "Has the applicant *ever* had a state professional license or controlled substance registration revoked, suspended, denied, restricted, *or placed on probation?*" (Emphasis added). Respondent answered this question in the negative on both applications and left the space for explanations of affirmative answers

blank.

In June 2001, a Diversion Investigator from DEA's Riverside office looking into Respondent's February 2001 renewal applications, contacted the California Board and learned that Respondent's medical license for that state had been **[*33205]** placed on probation. In October 2001, the investigator wrote a report concluding Respondent had not truthfully answered the liability questions and recommend initiation of the instant Show Cause proceedings.

Respondent testified at the **DEA** hearing that when he executed the two February 1998 applications, no discipline had yet taken effect against either his California or Louisiana medical licenses. When asked his understanding of the relevant question, Respondent replied he thought the question applied only to a separate state license to handle controlled substances, such as he had in Louisiana, and that no action had been taken against that license. He further testified he would have expected someone from DEA to contact him if there was a problem with the 1998 applications and that did not occur.

On cross-examination, Respondent acknowledged that as of January 5, 1998, he was aware he was entering into an agreement with the California Board which would result in his California medical license being placed on probation and that the questions on his February 1998 applications referred to *pending* disciplinary actions, in addition to discipline already imposed. Nonetheless, when asked, "isn't it true that, on February 25, 1998, you were aware that the California Medical Board was going to place [you] on probation?"—Respondent answered, "Yes, but that's not how I read that." Asked further what he thought the correct answer to the application's question was, Respondent replied, "My opinion would be the correct answer is no."

Similarly, when asked whether the February 2, 2001, Consent Order with the Louisiana Board resulted in a suspension or probation of his Louisiana medical license, Respondent replied the Consent Order was based on the California settlement and he had agreed not to practice in Louisiana and not renewed his license in that state.

With respect to the two 2001 DEA applications, Respondent testified his answers to question 3(d) were correct because the probationary period for his California medical license had run by that time and he thought the question referred to his controlled substance license, rather than his medical license.

The Controlled Substances Act specifies in 21 U.S.C. 824(a)(1) that the Deputy Administrator may revoke a DEA Certificate of Registration if she finds the registrant has materially falsified any application for DEA registration. The Act also provides in section 824(a)(4) that the Deputy Administrator may revoke a registration if she determines the registrant has committed acts that would render his continued registration inconsistent with the public interest, as that term is determined under 21 U.S.C. 823(f). That section requires the following factors be considered in determining the public interest:

(1) The recommendation of the appropriate state licensing board or professional disciplinary authority.

(2) The applicant's experience in dispensing, or conducting research with respect to controlled substances.

(3) The applicant's conviction record under Federal or State laws relating to the manufacture, distribution, or dispensing of controlled substances.

(4) Compliance with applicable State, Federal, or local laws relating to controlled substances.

(5) Such other conduct which may threaten the public health or safety.

These factors are to be considered in the disjunctive; the Deputy Administrator may rely on any one or a combination of factors and may give each factor the weight she deems appropriate in determining whether a registration should be revoked or an application for registration denied. See Henry J. Schwartz, Jr., M.D., 54 FR 16,422 (1989).

With regard to the public interest factors, the Deputy Administrator finds, in agreement with Judge Bittner as to factor one, that Respondent has regained his unrestricted license to practice medicine in California and this weighs in favor of continued registration. However, inasmuch as State license is a necessary but not sufficient condition for DEA registration, this factor is not determinative. See Edson W. Redard, M.D., 65 FR 30,616, 30,619 (2000); James C. LaJevic, D.M.D., 64 FR 55,962, 55,964 (1999).

As to factor two, Respondent's experience in handling controlled substances, Judge Bittner concluded that the recordkeeping deficiencies disclosed in the 1996 investigation indicated that continued registration would not be in the public interest. However, with regard to the 1996 audits, Judge Bittner concluded the evidence introduced at the DEA hearing was insufficient to show Respondent responsible for any shortages of controlled substances and thus weighed in favor of continued registration. The Deputy Administrator agrees with these conclusions.

As to factor three, there is no evidence Respondent has ever been convicted of a crime relating to controlled substances.

As to factor four, his compliance with applicable laws relating to controlled substances, Respondent's falsification of the renewal applications and the regulatory violations discussed above, establish he has not complied with the laws relating to controlled substances. The Deputy Administrator agrees with Judge Bittner that this factor weighs against continued registration.

As to factor five, other conduct that may threaten the public health and safety, Judge Bittner noted that, although Respondent committed various regulatory violations prior to 1996, his subsequent recordkeeping apparently complied with DEA regulations. She therefore found this factor weighs in favor of continued registration. The Deputy Administrator agrees.

In sum, Judge Bittner concluded Respondent corrected the recordkeeping deficiencies uncovered in 1996 and under the circumstances, the audit results did not warrant a finding that Respondent mishandled controlled substances during the period July 1995 to October 1996. She concluded that the factors considered pursuant to 21 U.S.C. 823(f), other than those relating to falsification of applications, did not establish that Respondent's continued registration was inconsistent with the public interest under 21 U.S.C. 824(a)(4). The Deputy Administrator agrees revocation is unwarranted under that section.

However, as Judge Bittner concluded, the issue of Respondent's falsification of renewal applications "is another matter." DEA has previously held that in finding there has been a material falsification of an application, it must be determined the applicant knew or should have known that the response given to the liability question was false. See Merlin E. Shuck, D.V.M., 69 FR 22,566 (2004); James C. LaJevic, D.M.D., supra, 64 FR 55,962; Martha Hernandez, M.D., 62 FR 61,145 (1997). In that regard, Judge Bittner found Respondent materially falsified four applications for renewal of his DEA registrations.

The two 1998 applications did not refer only to licenses to handle controlled substances, but to "a state professional license or controlled substance registration," and it is clear that applicants were required to report actions against their medical or other professional licenses, both completed and then-pending. Further, although the probation of Respondent's

California license did not take effect until March 13, 1998, the disciplinary action was obviously pending on February 25 and 28, 1998, when Respondent executed his applications. Also, regarding the two February 2001 applications, at that time Respondent's California license *had been* on probation and the fact that the [*33206] probationary period was over did not justify a negative answer to the question, as it asked whether the applicant "ever" had discipline take against a state license.

The Deputy Administrator also agrees with Judge Bittner's conclusions, made after observing Respondent's demeanor, that "Respondent's explanations for the misstatements and his continued insistence that his answers were correct are disingenuous at best" and that he materially falsified the applications, which establishes grounds for revoking his registrations under 21 U.S.C. 824(a)(1). n2

n2 Respondent signed the Consent Order with the Louisiana Board on February 2, 2001, however it was not effective until March 20, 2001. Judge Bittner noted that the 2001 DEA applications, which Respondent signed on February 27 and 28, 2001, did not specifically ask whether any disciplinary proceedings were then "pending." Accordingly, she concluded that, "at least arguably, Respondent was not required to disclose the Louisiana action inasmuch as it was not effective until March 20, 2001." While, given the wording of the application's questions, Respondent's omissions in failing to report this action may not have amounted to material misrepresentations under 21 USC 824(a)(1), it demonstrates his willingness to draw exceptionally fine lines in dealing with DEA regulators.

As Judge Bittner notes in her Opinion and Recommended Ruling, the governing statute is discretionary. See Mary Thomson, M.D., 65 FR 75,969 (2000). In exercising discretion in determining the appropriate remedy in any given case, the Deputy Administrator considers all the facts and circumstances of the case. See Martha Hernandez, M.D., *supra*, 62 FR 61,145.

In recommending revocation of Respondent's registrations, Judge Bittner concluded,

False statements on an application for DEA registration withhold from DEA information that is germane to the applicant's fitness to hold that registration. Kuen H. Chen, M.D., 58 FR 65401 (REA 1993). Further, as discussed above, Respondent insisted that his answers to the questions on his 1998 and 2001 applications for renewal of his DEA registrations were accurate.

They were not. In addition and also discussed above, Respondent's explanations of his answers on these applications were at best disingenuous. Respondent's cavalier attitude toward his responsibility to truthfully answer questions on the application raises serious concerns about whether he is willing to accept the other responsibilities inherent in a DEA registration. The Deputy Administrator has examined the record and finds the facts and credibility determinations of Judge Bittner to be well supported by the evidence. While the record does not establish that Respondent's continued registration would be inconsistent with the public interest, he materially falsified four applications for renewal of registration, which constitutes an independent ground for revocation.

The Deputy Administrator shares Judge Bittner's concern regarding Respondent's on-going refusal or inability to acknowledge a registrant's responsibility to provide forthright and complete information to DEA, when required to do so as a matter of law or regulation. This attitude, reflected most recently in his testimony at the hearing under oath, does not auger well for his future compliance with the responsibilities of a registrant.

Accordingly, the Deputy Administrator of the Drug Enforcement Administration, pursuant to the authority vested in her by 21 U.S.C. 823 and 824 and 28 CFR 0.100(b), and 0.104, hereby orders the DEA Certificates of Registration BP3420344 and BP4416029, issued to

MAR-17-06   12:13PM   FROM-                                          T-119   P.029/031   F-965

Felix K. Prakasam, M.D., be, and hereby are, revoked. The Deputy Administrator further
orders that any pending applications to renew or modify said registrations be denied. This
order is effective July 7, 2005.

Dated: May 25, 2005.

**Michele M. Leonhart,**

*Deputy Administrator.*

[FR Doc. 05-11248 Filed 6-6-05; 8:45 am]

BILLING CODE 4410-09-M

Source: Legal > Federal Legal - U.S. > FR - Federal Register [i]
Terms: prakasam and dee  (Edit Search)
View: Full
Date/Time: Monday, June 27, 2005 - 9:18 AM EDT

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

https://www.lexis.com/research/retrieve?_m=4a03f5a7764ba2ea2fa640ad008de650&csvc=      6/27/2005

TOTAL P.29

MAR-17-06   12:14PM   FROM-                                    T-119   P.030/031   F-965

LAW OFFICES OF

# JAMES JAY SELTZER

JAMES JAY SELTZER
ALSO A MEMBER OF NEW YORK BAR OC RAM

MONTEREY OFFICE
TEL (031) 649-3700

3300 POWELL STREET
SUITE 201
EMERYVILLE, CALIFORNIA 94608
FACSIMILE (510) 596-2519
TELEPHONE (510) 596-2500
E-MAIL lawofficos@jjseltzen.com

MAR-17-06   12:14PM   FROM-                                    T-118   P.031/031   F-955

LAW OFFICES OF
JAMES JAY SELTZER

**EXHIBIT "C"**



**JAMES RIVER GROUP**

| James River Insurance Company | Supplement Application for Mass Tort/Class Action |
|---|---|
| 7130 Glen Forest Drive, Suite 210 Richmond, VA 23226 804-289-2700 | **PROFESSIONAL LIABILITY Division** Email to PL@jamesriverins.com or, Fax to 804-287-2816 |

**APPLICANT'S INSTRUCTIONS:**

1. Answer all questions completely. Please attach extra sheets as required. Incomplete or illegible applications may be discarded.
2. Application must be signed and dated by the owner, partner, or officer not earlier than 45 days before the proposed effective date of coverage.
3. Please read the statements at the end of this application carefully. Thank you!

## SUPPLEMENT APPLICATION FOR MASS TORT/CLASS ACTION

Please answer all questions or indicate "Not Applicable". At your option, you may attach a description of your office's mass tort / class action practice.

Firm Name  Law Offices of James Jay Seltzer.

1. What types of mass tort or class action cases do you handle (details regarding issues, types of products, etc.)? Use extra page if needed to describe fully.  None .

2. How many mass tort or class action cases have you handled in the past 5 years?  None .

| | Yes | No |
|---|---|---|
| For these cases are you the "lead" attorney? | ☐ | ☐ |
| The "local" attorney? | ☐ | ☐ |
| The referring attorney? | ☐ | ☐ |
| If cases are only referred to other firms, are these other firms in other jurisdictions? If "Yes", where? _____ | ☐ | ☐ |
| Do you retain a fee for such referrals? | ☐ | ☐ |
| Do you continue to work on the case after referral? | ☐ | ☐ |
| If you are not the solo attorney, do you send your clients a letter outlining the specific scope of your representation? (I.e., advising them which tasks you are or are NOT performing, etc) | ☐ | ☐ |

3. How many clients do you typically represent for each case? _____

4. What is the dollar value of each (potential damages)? _____

5. Do you represent clients in other jurisdictions?     Yes ☐  No ☐

   If "Yes", where? _____

   What types of mass tort or class action cases are handled? _____

**NOTICE TO APPLICANT:** The coverage applied for is solely as stated in the policy. If policy is issued on a "CLAIMS MADE AND REPORTED" basis, it provides coverage only for those claims that are first made against the insured during the policy period unless the extended reporting period option is exercised in accordance with the terms of the policy.

The Insurer will rely upon this application and all such attachments in issuing the policy. If the information in this application or any attachment materially changes between the date this application is signed and the effective date of the policy, the Applicant will promptly notify the Insurer, who may modify or withdraw any outstanding quotation or agreement to bind coverage.

p. 2                                                                    Apr 04 06 04:07p

In New York: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

In all other states: It is a crime for any person to knowingly provide or facilitate in providing any false, incomplete, or misleading information to an insurance company. Penalties may include fines, imprisonment and denial of insurance benefits.

**WARRANTY:** I warrant to the Insurer, that I understand and accept the notice stated above and that the information contained herein is true and that it shall be the basis of the policy of insurance and deemed incorporated therein, should the Insurer evidence its acceptance of this application by issuance of a policy. I authorize the release of claim information from any prior insurer to James River Insurance Company, 7130 Glen Forest Drive, Richmond, VA 23226.

| Applicant's Name: | Signature |
|---|---|
| JAMES SELTZER | |
| Title: | Date: 03/23/2006 |
| Owner | |



| **James River Insurance Company** 7130 Glen Forest Drive, Suite 210 Richmond, VA 23226 804-289-2700 | **Securities Supplemental Application Lawyers** |
|---|---|
| | **PROFESSIONAL LIABILITY Division** Email to PL@jamesriverins.com or, Fax to 804-287-2616 |

**APPLICANT'S INSTRUCTIONS:**
1. Answer all questions completely. Please attach extra sheets as required. Incomplete or illegible applications may be discarded.

## SECURITIES SUPPLEMENTAL APPLICATION FOR LAWYERS

"Securities related activities" means securities or transactions which are subject to the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Advisors Act of 1940 or State blue Sky or securities laws or any amendments thereto.

1. a.  List the names of all lawyers engaged in securities and/or securities related activities:

| Name | Position | Years of Experience |
|---|---|---|
| James Seuper | Owner | 24+ years. |

b.  Attach a description of the lawyers qualifications and expertise in this specialty, including any continuing legal education courses taken by these lawyers in the past three years with regard to this specialty.

2. a.  State the gross income derived from securities and/or securities related activities:
   Last 12 months $ 1 million + Anticipated next twelve months $ 1 million +

b.  Does the Applicant accept securities in lieu of fees as payment for services rendered involving securities and/or securities related activities? ☐ Yes ☒ No   If yes, please provide a detailed narrative.

c.  Does the applicant have a policy prohibiting or restricting lawyers from investing with securities clients or otherwise entering into a business relationship (other than lawyer/client)? ☒ Yes ☐ No

d.  Does any lawyer have a business relationship (other than lawyer/client) with any person or entity other than those situations identified in the Outside Interest/Directors & Officers Supplemental Application?  If yes, please provide a detailed narrative. ☐ Yes ☒ No

3.  Attach a copy of the procedures utilized by the firm for screening new clients.

4. a.  Does the applicant follow any established "due diligence" Procedures?
   If yes, attach a copy of these procedures including any checklists utilized in conjunction therewith.  If no, attach a detailed description of steps taken to satisfy the "due diligence" requirements. ☐ Yes ☒ No Do not issue opinions or $]

b.  Is a "cold review" of securities transactions by an uninvolved member of the firm required prior to release of a signature?  If no, explain by separate attachment. ☐ Yes ☐ No

5.  Does the Applicant make recommendations as to the sale or purchase of any specific stocks, bonds or other securities related investments? If yes, please provide detailed narrative. ☐ Yes ☒ No

6. a.  List on the Securities Schedule all securities offerings, private placements, limited partnerships, syndications and bonds handled in the past 5 years.

b.  In addition to the transactions listed on the Securities Schedule is the Applicants involved in any other work involving securities or bond transactions? If yes, explain by separate attachment.
   ☐ Yes ☒ No

JRAP0051                          Page 1 of 2                    © James River Insurance Co. 2004

p. 4                                                                    Apr 04 06 04:07p

**NOTICE TO APPLICANT:** The coverage applied for is solely as stated in the policy. If policy is issued on a "CLAIMS MADE AND REPORTED" basis, it provides coverage only for those claims that are first made against the insured during the policy period unless the extended reporting period option is exercised in accordance with the terms of the policy.

The Insurer will rely upon this application and all such attachments in issuing the policy. If the information in this application or any attachment materially changes between the date this application is signed and the effective date of the policy, the Applicant will promptly notify the Insurer, who may modify or withdraw any outstanding quotation or agreement to bind coverage.

In New York: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

In all other states: It is a crime for any person to knowingly provide or facilitate in providing any false, incomplete, or misleading information to an insurance company. Penalties may include fines, imprisonment and denial of insurance benefits.

**WARRANTY:** I warrant to the Insurer, that I understand and accept the notice stated above and that the information contained herein is true and that it shall be the basis of the policy of insurance and deemed incorporated therein, should the Insurer evidence its acceptance of this application by issuance of a policy. I authorize the release of claim information from any prior insurer to James River Insurance Company, 7130 Glen Forest Drive, Richmond, VA 23226.

| Applicant's Name: | Signature |
|---|---|
| JAMES SELTZER | Dan Og Seltzer |
| Title: | Date: |
| Owner | 03/23/2006 |



| JAMES RIVER GROUP | James River Insurance Company 7130 Glen Forest Drive, Suite 210 Richmond, VA 23226 804-289-2700 | Civil Litigation – Plaintiff Supplemental Application |
| --- | --- | --- |
| | | PROFESSIONAL LIABILITY Division Email to PL@jamesriverins.com or, Fax to 804-287-2816 |

**APPLICANT'S INSTRUCTIONS:**

1. Answer all questions completely. Please attach extra sheets as required. Incomplete or illegible applications may be discarded.

If more than one attorney practices in this area, one supplement will suffice.

Name of Applicant Firm: _Law Offices of James Jay Seltzer_

Civil Litigation – Plaintiff includes the representation of a party in a civil action as plaintiff to recover damages arising from a tort-type actions such as libel and slander actions, legal and medical malpractice and product liability suits in which any form of personal injury or property damage is involved.

Which attorneys in the firm handle litigation?

What is their experience, i.e., number of cases handled and years as a litigator?

What is the average caseload per attorney on an annual basis? _50_

What percentage of matters are settled before trial, or resolved by motion? _95%_

Does your firm generally assign more than one attorney to actively participate in the litigation of a case? _yes_
If yes, what percentage of cases has two or more attorneys actively participating in litigation? _90%_

Does your firm have a policy of providing the client with copies of all pleadings and correspondence sent or received by the firm during the course of handling the litigation? _not all_

Prior to agreeing upon settlement terms, does your firm obtain written authority or confirmation from the client as to the terms and conditions upon which the case will be settled, including any monetary or other consideration to be paid or received by the client? _usually, not always._

What percentage of cases is handled on a contingency fee basis? _95%._

Describe types and general value of cases handled _0 – 300 million generally. MADD cases._

If you employ or engage an investigator in respect to your litigation practice, pleas explain. _No._

I understand information submitted herein becomes a part of my Professional Liability Application and is subject to the same terms and conditions.

Applicant Signature _James Jay Seltzer_ Title _Owner_ Date _3/26/2006_